T.C. Memo. 2006-40


UNITED STATES TAX COURT


ANSCHUTZ COMPANY AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6169-03.                    Filed March 13, 2006.


<u>John W. Bonds, Jr.</u>, <u>Andrew B. Clubok</u>, <u>Thomas L. Evans</u>,
<u>Matthew J. Gries</u>, <u>Todd F. Maynes</u>, <u>Herbert N. Beller</u>, <u>Mark B.
Hamilton</u>, and <u>Tony Y. Lam</u>, for petitioners.

<u>Virginia L. Hamilton</u> and <u>Michael C. Prindible</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioners' Federal income taxes:

| Tax Year Ended | Deficiency |
|----------------|------------|
| July 31, 1994  | $467,424   |
| July 31, 1995  | 4,837,121  |
| July 31, 1996  | 9,503,991  |

After concessions,[1] the issues for decision are:  (1) Whether

Qwest's incremental cost allocation method is a reasonable

allocation method for purposes of sections 263A and 460 for tax

years ended July 31, 1994 (1994), July 31, 1995 (1995), and July

31, 1996 (1996) (collectively, years in issue); and (2) whether

respondent abused his discretion in determining that Qwest's

incremental cost allocation method failed to clearly reflect

income under section 446.[2]

---

[1] Petitioners agree to:  (1) Decrease the cost of sales for costs allocated to conduits sold to Metropolitan Fiber Systems (MFS) in the MFS Dallas and MFS Los Angeles projects by $915,870 and $635,317, respectively, and increase the basis in the retained conduits installed for petitioners' own account during these projects by $915,870 and $635,317, respectively; and (2) decrease the cost of sales for costs allocated to conduit sold to MCI Telecommunications Corporation (MCI) in the MCI Dillard-Myrtle Creek project by $265,912, and increase the basis in the retained conduits installed for petitioners' own account during this project by $265,912.

The parties agree that adjustments proposed by respondent in the notice of deficiency for net operating loss, additional sec. 263A costs, additional sec. 263A(f) interest, adjustment to NOL carryover, and additional charitable deduction are computational adjustments that are dependent on our decision in this case.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Amounts are rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners were Delaware corporations with their principal place of business in Denver, Colorado.

I. Corporate Structure

Evergreen Leasing Corporation (Evergreen) was incorporated on June 10, 1966. Evergreen was primarily in the boxcar leasing business, but part of its charter indicated that Evergreen would provide telecommunications services. On March 20, 1989, Evergreen's name was changed to Southern Pacific Telecommunications Corporation (SP Telecom). In April 1995, SP Telecom's name was changed to Qwest.[3]

Qwest was formerly a wholly owned subsidiary of Southern Pacific Transportation Company (Southern Pacific). On September 30, 1991, Southern Pacific divested itself of its common stock interest in Qwest. As a result, Qwest became a 75-percent-owned subsidiary of Anschutz Company. On November 5, 1993, Anschutz Company purchased another 15 percent of Qwest. In August 1995, Anschutz Company purchased the remaining 10 percent of Qwest,

---

[3] For convenience purposes, Qwest and its previous business forms will be referred to as "Qwest".

making Qwest a wholly owned subsidiary.

During the years in issue, Phillip F. Anschutz (Mr. Anschutz) was the direct, sole owner of Anschutz Company. During the years in issue, Anschutz Company was the parent corporation of an affiliated group of corporations, as defined by section 1504(a), which included Qwest. Anschutz Company and its affiliated subsidiaries will hereinafter be referred to as petitioners.

Mr. Anschutz moved Qwest's headquarters from San Francisco to Denver in 1994 in order to have the company near his office for monitoring and control purposes. During the years in issue, Mr. Anschutz was in almost daily contact with Qwest executives. Mr. Anschutz had final approval on any decision by Qwest that involved investment.

## II. Evolution of Qwest's Telecommunications Business

While its charter indicated that it would provide telecommunications services, Qwest's initial involvement in the telecommunications business was not until 1987, when it acted as a liaison between Southern Pacific and MCI Telecommunications Corporation (MCI). Qwest's business operations further evolved through the years as it began constructing fiberoptic conduit systems. Qwest first worked as a general contractor and hired subcontractors to do the majority of the work. By the end of the years in issue, Qwest performed most of the construction on its

own.

A.    Development of Conduit-Encased Fiberoptic Cable

Prior to the late 1980s, long-distance carriers often buried cable directly in the ground.  In the late 1980s, the idea of encasing fiberoptic cable[4] in flexible conduit was developed. The conduit provides the cable greater protection from being cut, is more readily accessible for maintenance purposes, and, once buried, allows the installation of fiberoptic cable at a later date by pulling the cable through the buried conduit.  Fiberoptic cables, or fibers, are pulled through buried conduit by way of hand holes, which are installed at appropriate intervals along the conduit route.

B.    Use of Southern Pacific's Rights-of-Way to Install Conduit

As fiberoptic cable became the preferred medium for the long-distance transmission of data, Southern Pacific developed the idea of using its railroad rights-of-way to lay fiberoptic cable for long-distance data carriers.  The use of Southern Pacific's railroad rights-of-way was advantageous because:  (1) The easements already existed and thus negotiations with private

---

[4]  Optical fibers, each approximately the width of a human hair, are wound into cables, usually in multiples of 6 or 12. Each fiber can be individually connected to specialized optical equipment that makes possible the transmission of laser-generated light signals over the fibers.  Dark fibers are optical fibers that are not yet connected to the optical equipment.  Lit fibers are optical fibers that have been connected to the optical equipment and can transmit light signals.

owners and government agencies for such rights were not necessary; (2) specialized equipment could ride the rails and be used to perform the installation efficiently and economically; (3) railroad rights-of-way are often the most direct routes between locations; and (4) railroad rights-of-way are more secure than other rights-of-way, such as those for highways, telephone poles, or overhead power transmission lines.

### C.   Qwest as a Liaison

In 1987, Qwest first participated in a conduit project, acting as a liaison between Southern Pacific and MCI.  Qwest obtained an easement for MCI for the right to install conduit and fiber on a Southern Pacific right-of-way from Houston to Los Angeles.  MCI performed its own construction on this route.  In exchange for the easement, MCI paid approximately $13 million in cash and provided capacity in the form of 36 DS-3s along the route.[5]

### D.   Qwest's First Conduit Installation Project

#### 1.   Conduit Installation Process

Once Qwest began installing conduit and pulling fiber, as discussed infra, Qwest used Southern Pacific's railway and equipment in the construction process.  Qwest used a specialized rail plow to install the conduit along the railroad rights-of-

---

[5] Each DS-3 line represents capacity to transmit 672 long-distance calls simultaneously.

way.  The rail plow functioned as part of a plow train, which consisted of locomotives, rail plow cars, and several supply cars.  The supply cars carried the conduit and other construction materials needed for the installation and continuously fed these supplies to the rail plows.

As the locomotives pulled the plow train forward, the rail plow dug a trench and simultaneously lowered and buried the conduit.  The rail plow could install multiple conduits at the same time.  The rail plow installed the conduits at a depth of approximately 42 to 56 inches and at a distance of 8 feet from the nearest rail.  The rail plow also buried a warning tape approximately 1 foot from the surface and backfilled the land to its original contour.  The plow train could install conduits up to 4 miles a day, depending on the availability of track time and the severity of the terrain.

In situations where a rail plow could not be used, Qwest used a tractor plow, backhoe, or other similar machinery.  If the conduit needed to be laid across a bridge or through a tunnel, the conduit was typically placed in a galvanized steel pipe and attached to the side of the bridge or along the tunnel floor or wall.  If the conduit needed to be run under a river or other obstruction, regular or directional boring techniques were used to bore small tunnels through which the conduit could be fed.

After the conduit was buried along a railroad track or other right-of-way, or attached to a bridge or tunnel, Qwest could pull fiber through the conduit using hand holes.

### 2. The Coast Route Project

In December 1988, Qwest began its first conduit installation project along the Coast Route, a route running from Los Angeles to San Francisco. Qwest acted primarily as a general contractor and subcontracted out most of the construction work to third parties. The Coast Route project was performed for several long-distance carriers, including AT&T, Sprint, WilTel, and MCI. All of the Coast Route customers did not purchase conduit along the entire route, and each customer's fiberoptic cable was pulled only through the portions of the conduit purchased by that customer. However, Qwest laid multiple conduits along the entire route for its own potential future use or sale. Up to this point, installations of multiple conduits had not been done in the telecommunications industry.

As a result of the project, Qwest obtained several unconnected segments of empty conduit along the Coast Route. From the long-distance carriers, Qwest received cash compensation and capacity in the form of 18 DS-3s along MCI's fiberoptic cable. Qwest offered the DS-3 capacity as a wholesale opportunity to long-distance carriers.

E.    Other Projects Before the Years in Issue

On March 14, 1991, Qwest purchased an installed conduit system from MCI involving the Union Pacific right-of-way from Wells, Nevada, to Salt Lake City, Utah.

On September 30, 1991, Qwest entered into an easement agreement with Southern Pacific.  The agreement gave Qwest a nonexclusive easement along Southern Pacific's rights-of-way for the construction and operation of fiberoptic conduit systems.  Qwest also entered into additional easement agreements with other railroads and parties both before and during the years in issue.

III. Qwest's Operations During the Years in Issue

A.    Qwest's Five-Year Plans

During the years in issue, documents titled "five-year plans" were authored within Qwest.  The five-year plan for 1995 through 1999 (the 1995 five-year plan) stated "The primary business focus of [Qwest] is to create a nationwide, owned, facility based network and utilize it to carry profitable, revenue traffic."  The 1995 five-year plan also stated that Qwest would build 6,617 miles of fiberoptic conduit for its own use and 15,502 miles for sale to third-party customers.  The 1995 five-year plan estimated that, if the conduit were sold at an average of $30,000 per conduit mile, $465 million of revenue would be generated.  The $30,000 figure was arrived at by looking at prior

sales, and the value could be realized only if the conduit was actually sold.

Qwest hired Coopers & Lybrand LLP (CLC), a professional consulting firm, to review its 1995 five-year plan. CLC determined: (1) The demand for long-distance conduit builds had slowed; (2) the country did not need another nationwide fiberoptic network; (3) the creation of another network could not be justified in terms of capacity or cost; (4) Qwest would be at a cost disadvantage to existing nationwide carriers, such as MCI, AT&T, and Sprint; (5) Qwest's installation of additional conduit would be "very risky"; and (6) Qwest's revenue projections "may be optimistic".

Qwest's Board of Directors minutes for the period January 22, 1994, through December 23, 1996, do not contain any resolutions approving any of the five-year plans.

B. Construction Projects

During the years in issue, Qwest engaged in 21 construction projects, 19 of which were for third-party customers.[6] During the years in issue, Qwest performed the majority of the construction, only subcontracting out small portions of the work. In four construction projects, Qwest installed conduit or pulled fiber for third-party customers without retaining assets for

---

[6] The Cal Fiber and Dallas-Houston projects were not done for third-party customers.

itself (third-party-only projects).[7]  In 12 projects, Qwest installed conduit for third-party customers while simultaneously installing conduit along the same route for its own potential future use or sale (conduit installation projects).  In the remaining three projects, Qwest pulled fiber using conduit previously laid and retained by Qwest and granted third-party customers indefeasible rights of use (IRUs) in a certain number of fibers (IRU projects).

### 1.   Conduit Installation Projects

In the conduit installation projects, Qwest generally followed the same procedure:  (1) Qwest contracted with a third-party customer for installation of conduit over a certain route; (2) conduit was installed along Southern Pacific's or other railroad companies' rights-of-way; (3) Qwest received cash compensation or DS-3 capacity for installing the conduit; and (4) Qwest simultaneously installed and retained additional conduits for its own potential future use or sale.  Qwest and the customer negotiated and agreed to a fixed price, with adjustments possible under specific circumstances, for Qwest to install conduit over a particular route.  During the years in issue, Qwest charged its customers approximately $30,000 to $40,000 per conduit mile.

---

[7]  The third-party-only projects include:  (1) USW Clifton-Rifle; (2) PAC Bell; (3) USW Romero-Santa Fe; and (4) MFS Denver IRU.  These projects are not directly in issue and will not be discussed in detail.

The customer purchased fiberoptic cable separately, and Qwest or the customer pulled the fiber through the conduit. The entire conduit and fiber became the property of the customer once the contract was completed.

In addition to installing conduit for its customers, Qwest installed additional conduits for its own potential future use or sale. The rail plow allowed Qwest to install multiple conduits at the same time and at a relatively modest additional cost. Generally, the only additional costs of adding the retained conduits were the cost of the material, including the conduit and hand holes, and the cost of handling that material. These costs were mostly covered by profits from the third-party customer contracts.

At the time of installation, Qwest did not have customers lined up to purchase the retained conduit. With rare exception, Qwest always kept at least one conduit for itself in connection with all of its conduit projects.

Petitioners have conceded the adjustments to the MFS Los Angeles, MFS Dallas, and MCI Dillard-Myrtle Creek projects. See supra note 1. The nine conduit installation projects still in issue, in chronological order, are: (1) MCI San Jose to Reno, and Reno to Wells; (2) MCI Salt Lake City to Denver; (3) Viacom San Francisco Bay; (4) MCI Denver to El Paso; (5) MCI Kansas City to St. Louis; (6) US West Phoenix to Mesa; (7) MCImetro Dallas; (8)

US West Grants to Gallup; and (9) MFS Anaheim.  The third-party customer contracts for these nine conduit installation projects constitute long-term contracts as defined by section 460(f).

      2.   IRU Projects

By November 1995, Qwest was in negotiations with WorldCom Network Services, Inc. (WorldCom), for rights to use a limited number of fibers in fiberoptic cable installed along particular routes.  On February 26, 1996, Qwest granted WorldCom an IRU in 24 dark fibers over three routes:  (1) WorldCom Dallas-Houston; (2) WorldCom Denver-El Paso; and (3) WorldCom Santa Clara-SLC. Pursuant to the IRU agreement, Qwest pulled fiber for the three IRU projects, as described above.

In addition to pulling fiber for WorldCom, Qwest also pulled fiber for its own potential future use or sale.  Instead of pulling 24-fiber fiberoptic cables, Qwest pulled cables with a larger number of fibers.  While WorldCom had an IRU in 24 of the fibers, Qwest retained control over the remaining fibers in the same cable.

The IRU agreement constitutes a long-term contract as defined by section 460(f).  For tax purposes, Qwest's granting of the IRUs to WorldCom was treated as a sale of those fibers.  The total contract price for the IRU agreement was $65,196,466.

3.   Projects With No Third-Party Customer[8]

In two instances, Qwest installed conduit and pulled fiber for itself without having a customer contract in place.

In the Cal Fiber project, Qwest linked unconnected segments of empty conduit.  The unconnected segments of conduit were previously installed and retained by Qwest as part of the Coast Route project.

Qwest completed the Cal Fiber project in March 1995 by laying 153 miles of new conduit, pulling fiber through the conduit, and lighting the fiber.  The Cal Fiber project gave Qwest a completed fiberoptic system from Roseville, California, to Los Angeles, California.  Qwest's total construction cost for the Cal Fiber project was $32,496,284.  Northern Telecom Finance Corporation provided financing for the majority of the Cal Fiber project costs, with the balance funded by internal financing.

In the Dallas-Houston project, Qwest installed conduit, pulled fiber, and lit the fiber for its own account.  Qwest began construction of the Dallas-Houston project in February 1995 and completed it in May 1997.  At the time Qwest began the Dallas-Houston project, Qwest anticipated that WorldCom Network Services, Inc., d.b.a. WilTel (WilTel), would purchase the conduit, which it in fact did.  The Dallas-Houston project

---

[8]  Cost allocations relating to projects without third-party customers are not in issue.

resulted in approximately 270 conduit miles and a total construction cost of $25,249,137.

    C.    Telecommunication Services

During the years in issue, Qwest also provided telecommunication services, which included:  (1) Selling of transmission capacity in bulk, including both dedicated line and switched services, to interexchange carriers and competitive access providers; and (2) providing long-distance services to a customer base of end users in the business, education, and government sectors, also known as commercial services. Qwest provided its telecommunication services primarily using capacity it received:  From leases with other long-distance carriers; from certain of its customers' fiberoptic cables; from the digital microwave transmission network acquired through its purchase of Qwest Transmission, Inc. (Qwest Transmission), in January 1995; and from the fiberoptic systems it owned along the Dallas-Houston and Cal Fiber routes.

Qwest initially started to market its switched services and commercial services by hiring a sales force in 1994 and 1995. The focus was on cities such as Los Angeles, Phoenix, San Francisco, Denver, and Salt Lake City.  By 1996, Qwest cut back on the sales activities because maintaining the sales staff and offices and leasing transmission capacity from other long-distance carriers became too expensive.

D.   Other Transactions

    1.   Advantis

On September 10, 1993, Qwest entered into an asset and stock purchase agreement with Advantis, a communications network joint venture of IBM and Sears Roebuck Company (Sears), carrying Sears and IBM voice and data traffic worldwide.  Pursuant to this agreement, on November 5, 1993, Qwest sold Advantis substantially all of its then-owned capacity rights in the fiberoptic cables owned by MCI along with certain realty and related equipment.  In exchange, Qwest received $185 million and the right to use the capacity sold to Advantis, if not needed by Advantis, free of charge in order to provide service to Qwest's dedicated line customers for the 12-month period following the date of the sale to Advantis.  Qwest also agreed to lay conduit and pull fiber between Los Angeles and Sacramento and provide Advantis with a certain portion of this capacity.

    2.   Qwest Transmission

Qwest Communications, Inc. and Subsidiaries (Qwest Communications) were in the telecommunications business as a carrier's carrier, providing digital private line service to the long-distance industry since 1981.  On April 6, 1995, Qwest Communications changed its name to Qwest Transmission.[9]

---

[9]  To avoid confusion, Qwest Communications is hereinafter referred to as Qwest Transmission.

On January 31, 1995, Qwest purchased all of the outstanding stock of Qwest Transmission for $18,770,000.  Qwest Transmission had an existing digital microwave radio network serving an approximately 3,500 mile route, ranging from the Texas-Mexico border to Cincinnati, then branching off to Chicago and Philadelphia.[10]  At the same time as the Qwest Transmission acquisition, Qwest also acquired Qwest Properties, Inc., a lessor of a telecommunications switching facility[11] in Dallas, Texas.

Qwest Transmission's available capacity allowed Qwest to transfer existing revenue traffic to the Qwest Transmission network, reducing its current leased facility expense.

### 3.   Fiber Systems, Inc.

In January 1995, Qwest purchased certain assets from Fiber Systems, Inc. for $1,750,000, which were placed into an Anschutz Company subsidiary, FSI Acquisition Corporation.

### 4.   Five Star Telecom, Inc.

In March 1996, Qwest's Board of Directors agreed to enter into leases with Five Star Telecom, Inc., for three switches in

---

[10]   Microwave systems, the development of which predated the development of fiberoptic technology, offer a means of transmitting lower volume and narrower bandwidths of voice, data, and video signals.  Microwave systems use radio frequencies to transmit data between transmission towers.

[11]   A switch is a device that selects the paths or circuits to be used for transmission of information and establishes a connection.

New York, Florida, and Indiana.

### 5. WilTel

On July 1, 1996, WilTel and Qwest entered into an asset purchase agreement, in which Qwest sold its right, title, and interest in certain telecommunications service agreements for $5,500,000.

### 6. Frontier Communications

In 1995, Qwest began negotiations with Frontier regarding the use of optical fibers and other related property. On October 18, 1996, Qwest executed an IRU agreement with Frontier Communications, granting Frontier Communications the right to use certain optical fibers and other property in a fiberoptic telecommunications system to be constructed by Qwest.

### 7. MFS of California, Inc.

On November 1, 1994, Qwest and MFS of California, Inc. (MFS) entered into a conduit exchange, in which Qwest exchanged approximately 47 miles of conduit between San Jose and Oakland for approximately 60 miles of conduit constructed by MFS from San Francisco to San Jose.

In June 1996, Qwest and MFS entered into an optical fiber swap agreement for the exchange of 12 dark fibers from the San Francisco and Oakland Bay Bridges to both parties' points of

presence (POPs).[12]  The purpose of the agreement was to provide connectivity to the POPs.

### 8.  MCI Swaps

On April 3, 1995, Qwest entered into a letter agreement with MCI for construction/conduit swaps in Santa Barbara, San Jose, Sacramento, and St. Louis.

## IV.  Qwest's Incremental Cost Allocation Method

During the years in issue, petitioners used an accrual method of accounting for tax purposes.  In most cases, petitioners reported income from their customer contracts using the percentage of completion method.

Because Qwest was engaged in the simultaneous installation and sale of conduit or fiber to third-party customers and the installation and retention of additional conduits or fibers for its own potential future sale or use, Qwest allocated total project costs between the third-party contracts and the retained assets using an incremental cost allocation method.  Qwest developed the incremental cost allocation method in part by looking at third-party subcontractors' bids to install conduits. Bids to install only one conduit, when compared to the bids to install multiple conduits, indicated that the third-party subcontractors increased the bid on an incremental basis as more

---

[12]  A POP is the point at which a line from a long-distance carrier connects to the line of the local telephone company or to the user if no local telephone company is involved.

conduits were added.

Qwest's incremental cost allocation method is described as follows:  (1) Qwest allocated to the customer contracts what it determined to be direct costs associated with those contracts; (2) Qwest allocated to its retained assets what it determined to be the direct costs associated with its retained conduits and fibers; and (3) Qwest allocated what it determined to be indirect costs incrementally between the customer contracts and its retained assets.  The incremental cost allocation method was used for both the conduit installation projects and the IRU projects, but the method varied slightly.

A.   Incremental Cost Allocation Method in the Conduit Installation Projects

To determine what costs should be allocated to Qwest's retained conduits in the conduit installation projects, Qwest developed an incremental base rate.  By evaluating Qwest's construction costs, Senior Vice President for Construction Daniel O'Callaghan (Mr. O'Callaghan) and Qwest Assistant Vice President Ronald Pearce (Mr. Pearce) determined that an incremental base rate of $6,019 per conduit mile should be utilized.  The incremental base rate included:  (1) $2,376 for conduit material, assuming a cost to Qwest of 45 cents per foot; (2) $370 for other material related to installation; (3) $2,640 for labor attributable to the installation of the additional conduit; (4) $581 for equipment costs; and (5) $53 for overhead.  The

incremental base rate could be adjusted to reflect variations in conduit material costs.  For example, Qwest adjusted its incremental base rate for the MCI Denver-El Paso conduit project from $6,019 to $6,500 per conduit mile due to an increase in conduit material costs from $2,376 to $2,856 per mile.[13]

The incremental base rate did not include the cost of digging the trench or the costs associated with perfecting the rights-of-way because these costs would have been incurred when installing the conduit for the third-party customer regardless of whether Qwest chose to install additional conduit.  The incremental base rate did not include adjustments based on terrain and was not increased as a result of budget overruns.

Using the incremental base rate, with appropriate adjustments, Qwest determined the incremental costs per conduit mile of conduits retained by Qwest were:

| Project | Incremental cost per conduit mile |
| --- | --- |
| MCI San Jose-Reno-Wells | $8,129 |
| MCI Salt Lake City-Denver | 7,629 |
| MFS Los Angeles | 6,019 |
| MFS Dallas | 6,019 |
| Viacom San Francisco Bay | 6,019 |
| MCI Denver-El Paso | 6,500 |
| MCI Kansas City-St. Louis | 5,999 |
| US West Phoenix-Mesa | 5,066 |
| MCImetro Dallas | 5,417 |
| US West Grants-Gallup | 6,806 |
| MFS Anaheim | 6,584 |

---

[13]  The $1 discrepancy is due to rounding.

Using the MCI Denver-El Paso project as an example, Qwest used the incremental cost allocation method as follows:[14]

Indirect costs allocated to Qwest's retained assets

| | |
|---|---|
| Qwest conduit miles | 2,295 |
| Times: incremental cost/mile | * $6,500 |
| | $14,917,629 |
| Plus: Qwest capitalized interest | + 1,072,296 |
| Project costs allocated to Qwest | $15,989,925 |

Indirect costs allocated to customer contracts

| | |
|---|---|
| Total project costs | $39,151,405 |
| Less: project costs allocated to Qwest | (15,989,925) |
| Project costs allocated to customer | $23,161,480 |
| Divide: customer conduit miles | / 761 |
| Incremental cost/mile allocated to customer | $30,422 |

B.    Incremental Cost Allocation Method in the IRU Projects

Qwest also used an incremental cost allocation method to allocate costs for the IRU projects involving WorldCom.  For these projects, Qwest allocated existing conduit costs, the labor costs of pulling fiber, and right-of-way costs entirely to the IRU agreement because these costs did not increase by installing a cable with more than 24 fibers.[15]  The cost of new conduit, or

---

[14]  We note that these calculations were provided by petitioners, and there appear to be mathematical errors. However, because petitioners relied on these calculations, we have left the errors uncorrected.

[15]  For the WorldCom Dallas-Houston project, since the fiber was previously installed for Qwest's account, Qwest allocated the existing conduit costs, the costs of pulling fiber through that

(continued...)

endlinks, was allocated to the IRU agreement, and if any retained conduit was installed, the incremental cost of adding such conduit was allocated to Qwest's retained assets. Finally, Qwest allocated cable material, splicing, and testing costs between the IRU agreement and its retained assets based on the ratio of fibers sold to WorldCom to fibers retained by Qwest. As an example, in the Dallas-Houston IRU project, Qwest installed a 72-fiber fiberoptic cable, and WorldCom had an IRU in 24 of those. Qwest allocated 24/72ths of the costs of cable material, splicing and testing to the IRU agreement and 48/72ths to Qwest's retained assets.

## V. Tax Returns for the Years in Issue

Petitioners timely filed consolidated Federal income tax returns for the years in issue.

On February 4, 2003, respondent mailed a notice of deficiency to petitioners for the years in issue. As reflected in the notice of deficiency, respondent determined that an average cost allocation approach should be used for all of petitioners' conduit installation and fiber pulling projects. In the notice of deficiency, respondent explained:

> certain incremental costs included in your cost of
> sales claimed on your tax returns for taxable years
> ending 7-31-94, 7-31-95 and 7-31-96 in the amounts of
> $20,149,787, $10,977,427 and $14,602,442, respectively,

---

[15](...continued)
conduit, and the right-of-way costs to Qwest's retained assets.

are not allowable because they are capital expenditures. Accordingly your income is increased by $20,149,787, $10,977,427 and $14,602,442 for taxable years ending 7-31-94, 7-31-95 and 7-31-96 respectively.

Using the MCI Denver-El Paso project as an example, respondent allocated the project costs as follows:[16]

| | |
|---|---|
| Total project costs | $39,151,405 |
| Less: direct costs allocated to customer | ( 1,279,689) |
| Project costs to allocate | $37,871,716 |
| Divide: total conduit miles | / 3,056 |
| Average cost per conduit mile | $12,391 |
| | |
| Multiply: customer conduit miles | * 761 |
| Costs allocated to customer | $9,433,853 |
| Add: direct costs allocated to customer | + 1,279,689 |
| Project costs allocated to customer | $10,713,542 |
| | |
| Total project costs | $39,151,405 |
| Less: project costs allocated to customer | (10,713,542) |
| Project Costs Allocated to Qwest | $28,437,863 |

On April 24, 2003, petitioners filed a petition with this Court disputing the determinations in the notice of deficiency. As relevant, petitioners state:

The Commissioner * * * erred in failing to determine that petitioners properly and reasonably allocated costs between long-term contracts with customers for the installation of conduit or fiber optic cable and additional conduit or fiber optic cable retained by petitioners in accordance with applicable Treasury regulations, and in failing to determine that

---

[16] We note that these calculations were provided by respondent, and there appear to be mathematical errors. However, because respondent relied on these calculations, we have left the errors uncorrected.

petitioners' method of allocating costs between long-term contracts and retained assets clearly reflected their income.

OPINION

Respondent contends that Qwest's incremental cost allocation method is not a reasonable allocation method under section 1.263A-1(f)(4), Income Tax Regs. Further, respondent asserts that Qwest's incremental cost allocation method fails to clearly reflect income, and thus respondent may change it to an average cost allocation method. Petitioners argue that Qwest's incremental cost allocation method was reasonable because it was based on Qwest's decision-making process and on the economic reality of the underlying transactions.

To reach our holdings, we must first lay out the statutory and regulatory framework and determine how the Code sections in issue apply to the instant case. Second, we must determine the meaning of "reasonable allocation" for purposes of sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs., and then decide whether Qwest's incremental cost allocation method satisfies this requirement. Finally, we must determine whether respondent abused his discretion in finding that Qwest's incremental cost allocation method failed to clearly reflect income under section 446 and the regulations thereunder.

I.    <u>Statutory and Regulatory Framework</u>

The parties agree that two Code sections are implicated by Qwest's incremental cost allocation method, sections 263A and 460.  However, the parties differ on the interpretation of each section and its accompanying regulations and how each is applied to the facts of the instant case.

A.    <u>Section 460:  Allocation of Costs to Long-Term Contracts</u>

Qwest's cost allocation to its customer contracts is governed by section 460.  Section 460 contains special rules for the tax reporting of long-term contracts.  In general, section 460 requires that the taxable income from a long-term contract shall be determined under the percentage of completion method.  Sec. 460(a).  A long-term contract is defined as one which is not completed within the same taxable year in which the contract was entered into.  Sec. 460(f)(1).  The contract must be for the manufacture, building, installation, or construction of property.  <u>Id.</u>  Section 460(c)(1) provides that all costs which directly benefit or are incurred by reason of the long-term contract shall be allocated to such contract in the same manner as costs are allocated to extended period long-term contracts under section 451 and the accompanying regulations.  We are thus directed to

the regulations at section 1.451-3(d)(6), Income Tax Regs., to allocate costs to a long-term contract.[17]

The regulations provide that direct material and direct labor costs attributable to a long-term contract must be allocated to that long-term contract.[18]  Sec. 1.451-3(d)(6)(i), Income Tax Regs.; see also sec. 1.451-3(d)(5), Income Tax Regs. Indirect costs, those costs other than direct material and direct labor costs, are subject to two levels of allocation.[19]  See sec. 1.451-3(d)(6)(ii), (8)(iv), Income Tax Regs.

In the first level allocation, the regulations recognize that some indirect costs benefit both long-term contracts and "other activities of the taxpayer."  Sec. 1.451-3(d)(6)(ii), Income Tax Regs.  "Accordingly, such costs require a reasonable allocation between the portion of such costs that are

---

[17]  The Commissioner issued regulations pursuant to sec. 460, applicable to contracts entered into on or after Jan. 11, 2001.  Sec. 1.460-1(h)(1), Income Tax Regs.  These regulations do not apply to the instant case.

[18]  Direct material costs are costs of materials that have "become an integral part of the subject matter * * * and those materials which are consumed in the ordinary course of building, constructing, installing or manufacturing the subject matter".  Sec. 1.451-3(d)(6)(i), Income Tax Regs.  Direct labor costs are the costs of labor that "can be identified or associated with a particular * * * long-term contract."  Id.

[19]  The regulations under secs. 460 and 263A do not use the terminology "first level" and "second level" allocations. However, the effect of those regulations is to break the allocations into two distinct steps.  For purposes of clarity, we refer to these steps as "first level" and "second level".

attributable to * * * long-term contracts and the portion attributable to the other activities of the taxpayer." Id. If indirect costs need only be allocated between one long-term contract and the taxpayer's other activities, the allocation stops at the first level.

If indirect costs must be allocated to multiple long-term contracts, the regulations provide a second level allocation:

> The indirect costs required to be allocated to a long-term contract under paragraph * * * (d)(6)(ii) of this section shall be allocated to particular contracts for the year such costs are incurred using either--
>
> (A) A specific identification (or "tracing") method, or
>
> (B) A method using burden rates, such as ratios based on direct costs, hours, or other items, or similar formulas, so long as the method employed for such allocation reasonably allocates indirect costs among long-term contracts completed during the taxable year and long-term contracts that have not been completed as of the end of the taxable year. * * *

Sec. 1.451-3(d)(8)(iv), Income Tax Regs.

B.  Allocation of Costs to Property Produced by the Taxpayer Under Section 263A

Section 263A governs the capitalization of costs for property produced by the taxpayer and property acquired by the taxpayer for resale.[20]  Sec. 263A(a) and (b)(1). Section 263A does not apply to any property produced by the

---

[20]  The term "produced" includes constructed, built, installed, manufactured, developed, or improved.  Sec. 263A(g).

taxpayer pursuant to a long-term contract. Sec. 263A(c)(4). Under section 263A, as relevant to the present case, the direct costs and certain indirect costs allocable to real or tangible personal property produced by the taxpayer must be capitalized. Sec. 263A(a)(1); sec. 1.263A-1(a)(3), Income Tax Regs.[21] Direct costs that must be capitalized include direct material and direct labor costs. Sec. 1.263A-1(e)(2), Income Tax Regs. Indirect costs that must be capitalized are those costs that are properly allocable to the property produced when those costs directly benefit or are incurred by reason of the production activities. Sec. 1.263A-1(e)(3)(i), Income Tax Regs.

Like the regulations under section 451, the regulations under section 263A provide for two levels of allocation for indirect costs. See sec. 1.263A-1(e)(3)(i), (f)(4), (g)(3),

---

[21] Though not called to our attention by the parties, the current regulations under sec. 263A apply to taxable years beginning after Dec. 31, 1993. Sec. 1.263A-1(a)(2)(i), Income Tax Regs. The current regulations provide that, for taxable years beginning before Jan. 1, 1994, a position taken on a tax return when applying sec. 263A will be considered reasonable if consistent with the temporary regulations. Sec. 1.263A-1(a)(2)(ii), Income Tax Regs.; see also sec. 1.263A-1T, Temporary Income Tax Regs., 57 Fed. Reg. 12419 (Apr. 10, 1992). Therefore, the temporary regulations are relevant to the first year in issue, and the current regulations apply to the last 2 years in issue. While the temporary and current regulations differ in structure, the rules provided therein are essentially the same. Because the difference in structure does not impact our rationale, the temporary regulations will not be discussed further.

Income Tax Regs. In the first level allocation, "Indirect costs may be allocable to both production and resale activities, as well as to other activities that are not subject to section 263A. Taxpayers subject to section 263A must make a reasonable allocation of indirect costs between production, resale, and other activities." Sec. 1.263A-1(e)(3)(i), Income Tax Regs. If the indirect costs need only to be allocated between one item of taxpayer-produced property and the taxpayer's other activities, or between one item of property acquired for resale by the taxpayer and the taxpayer's other activities, the allocation stops at the first level.

If indirect costs must be allocated among different items of property subject to section 263A, the regulations provide for a second level allocation. See sec. 1.263A-1(f), Income Tax Regs. The cost allocation method used at the second level must be reasonable under section 1.263A-1(f)(4), Income Tax Regs. Sec. 1.263A-1(g)(3), Income Tax Regs. For the second level allocation, the regulations provide:

> A taxpayer may use the methods described in paragraph
> (f)(2) [specific identification method] or (3) [burden
> rate and standard costs methods] of this section if
> they are reasonable allocation methods within the
> meaning of this paragraph (f)(4). In addition, a
> taxpayer may use any other reasonable method to
> properly allocate direct and indirect costs among units
> of property produced or property acquired for resale

during the taxable year. An allocation method is reasonable if, with respect to the taxpayer's production or resale activities taken as a whole--

(i) The total costs actually capitalized during the taxable year do not differ significantly from the aggregate costs that would be properly capitalized using another permissible method described in this section or in §§ 1.263A-2 and 1.263A-3, with appropriate consideration given to the volume and value of the taxpayer's production or resale activities, the availability of costing information, the time and cost of using various allocation methods, and the accuracy of the allocation method chosen as compared with other allocation methods;

(ii) The allocation method is applied consistently by the taxpayer; and

(iii) The allocation method is not used to circumvent the requirements of the simplified methods in this section or in § 1.263A-2, 1.263A-3, or the principles of section 263A.

Sec. 1.263A-1(f)(4), Income Tax Regs.

C. <u>Application of Sections 460 and 263A to Qwest's Conduit Installation Projects</u>

The instant case presents a unique issue: When a taxpayer performs a long-term contract and simultaneously produces property retained by the taxpayer, how are the indirect costs of the two activities allocated under sections 263A and 460? The sections, applicable regulations, and prior caselaw provide limited guidance as to how the two Code sections interact when both must be applied to the same project.

Respondent asserts that the order in which the Code sections and regulations are applied will make a difference in the outcome

of the amount of indirect costs that must be capitalized under section 263A and the amount of costs that must be recovered under the percentage of completion method of section 460.[22]  However, a careful reading of the regulations shows that the rule for the first level allocation is identical under both regimes, and thus the order in which they are applied is irrelevant.  The Code sections and regulations work in tandem to provide for a single, comprehensive set of cost allocation rules.

First, we must clarify what costs and which level of cost allocation are at issue in the instant case.  Both parties agree that Qwest's first level allocation of indirect costs is at issue; i.e., how Qwest allocates indirect costs between its long-term customer contracts and its self-produced retained assets.  Thus, our focus will remain on the first level allocation of indirect costs.

Sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs., provide the rules for the first level allocations.  Both sections require the taxpayer to make a "reasonable allocation"

---

[22]  Respondent then argues that sec. 263A should be applied first.  However, respondent ignores the language of sec. 263A(c)(4), which provides that sec. 263A does not apply to any property produced by the taxpayer pursuant to a long-term contract as defined by sec. 460.  Given this language, the argument could be made that, in situations such as the present case, sec. 460 would apply first.  Petitioner does not raise this argument.  In our analysis, infra, we find that the order of application of the sections is not determinative of the outcome, and thus we do not discuss this argument further.

of costs between: (1) Activities subject to that section (either taxpayer-produced property and property held for resale or long-term contracts); and (2) "other activities". See secs. 1.263A-1(e)(3)(i), 1.451-3(d)(6)(ii), Income Tax Regs. Neither section provides a definition of "reasonable allocation."[23] See secs. 1.263A-1(e)(3)(i), 1.451-3(d)(6)(ii), Income Tax Regs. Because the rules for the first level allocation are the same, the result will not differ depending on which section is applied first, as respondent contends. Instead, the rules can be applied simultaneously to a first level allocation.

After the first level allocation is complete, costs will be separated between long-term contracts, taxpayer-produced property or property held for resale, and if applicable, other property not subject to either section. For the second level allocations, section 1.263A-1(f) and (g), Income Tax Regs., will govern all costs previously allocated to the taxpayer-produced property or property held for resale. Section 1.451-3(d)(8)(iv), Income Tax Regs., will govern all costs previously allocated to the long-term contracts.

As applicable to the instant case, in its first level allocation, Qwest must make a "reasonable allocation" of indirect costs between its customer contracts and its retained assets.

---

[23] Respondent contends that the reasonableness standard found in sec. 1.263A-1(f)(4), Income Tax Regs., should apply to the first level of allocation. This argument is addressed infra.

See secs. 1.263A-1(e)(3)(i), 1.451-1(d)(6)(ii), Income Tax Regs.

Next, we must define "reasonable allocation" for purposes of

sections 1.263A-1(e)(3)(i) and 1.451-1(d)(6)(ii), Income Tax

Regs., and then determine whether Qwest's incremental cost

allocation method satisfies that definition.

II.  Definition of "Reasonable Allocation" for Purposes of
     Sections 1.263A-1(e)(3)(i) and 1.451-1(d)(6)(ii), Income Tax
     Regs.

Respondent argues that the language of section 1.263A-

1(g)(3), Income Tax Regs., requires that the reasonableness

standard of section 1.263A-1(f)(4), Income Tax Regs., governs the

first level allocations in the present case.  In the alternative,

respondent contends that the reasonableness standard of section

1.263A-1(f)(4), Income Tax Regs., should be incorporated into the

undefined phrase "reasonable allocation" in sections 1.263A-

1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.  To support

this contention, respondent notes the parallel structure of the

regulations under sections 263A and 451 and cites legislative

history.  On the other hand, petitioners contend that because

"reasonable allocation" is not defined by sections 1.263A-

1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs., "reasonable"

should be interpreted using its ordinary meaning.

A.   The Language of Section 1.263A-1(g)(3),
     Income Tax Regs.

Respondent argues that the language of section 1.263A-

1(g)(3), Income Tax Regs., requires that the reasonableness

standard of section 1.263A-1(f)(4), Income Tax Regs., governs the
first level allocation in the present case. Specifically,
respondent states:

> As a preface to Treas. Reg. §1.263A-1(g),
> paragraph (f)(1) states that paragraph (g) provides
> general rules of applying paragraph (f)'s detailed
> allocation methods. In the general rule applicable to
> this case, Treas. Reg. § 1.263A-1(g)(3) provides that
> Common Costs are generally to be first allocated to
> "intermediate cost objectives." The regulation uses
> "activities" to illustrate what is meant by
> intermediate cost objectives. Thus, it intends that
> the phrase "intermediate cost objectives" refers to the
> first level of cost allocation referenced above, i.e.,
> between § 263A activities and other activities. Treas.
> Reg. § 1.263A-1(c). Treas. Reg. § 1.263A-1(g)(3)
> further states that this allocation of Common Costs at
> the intermediate level, or first level of allocation
> between section 263A and non-263A activities, is to be
> allocated using * * * any other reasonable allocation
> method as defined under paragraph (f)(4).

Respondent's argument is premised on the notion that section
1.263A-1(g)(3), Income Tax Regs., governs Qwest's first level
allocations between its customer contracts and its retained
assets. However, respondent's interpretation of section 1.263A-
1(g)(3), Income Tax Regs., is not supported by the language of
sections 1.263A-1(f)(1), (g)(1) and (2), Income Tax Regs.

In pertinent part, section 1.263A-1(f)(1), Income Tax Regs.,
provides: "The language of paragraph (f) sets forth various
detailed * * * cost allocation methods * * * [used] to allocate
direct and indirect costs to property produced and property
acquired for resale." This language explicitly limits the cost
allocation methods of section 1.263A-1(f), Income Tax Regs., to

property already subject to section 263A. Section 1.263A-1(f)(1), Income Tax Regs., goes on to state: "Paragraph (g) of this section provides general rules for applying <u>these allocation methods</u> to various categories of costs." (Emphasis added.) This language indicates that section 1.263A-1(g), Income Tax Regs., gives general rules for applying cost allocation methods already limited to property subject to section 263A. Because the first level allocation deals with property not subject to section 263A, we find the language of section 1.263A-1(f)(1), Income Tax Regs., limits the application of section 1.263A-1(g), Income Tax Regs., to the second level allocation.

This interpretation is supported by the language of section 1.263A-1(g)(1) and (2), Income Tax Regs. Section 1.263A-1(g)(1), Income Tax Regs., provides that "Direct material costs * * * must be allocated <u>to the property produced or property acquired for resale</u> by the taxpayer using the taxpayer's method of accounting * * *." (Emphasis added.) Section 1.263A-1(g)(2), Income Tax Regs., provides that "Direct labor costs * * * are generally allocated <u>to property produced or property acquired for resale</u>". (Emphasis added.) The above-emphasized language limits those subparagraphs to property already subject to section 263A.

Section 1.263A-1(g)(3), Income Tax Regs., states:

Indirect costs * * * are generally allocated to intermediate cost objectives such as departments or activities prior to the allocation of such costs to property produced or property acquired for resale.

Indirect costs are allocated using either a specific identification method, a standard cost method, a burden rate method, or any other reasonable allocation method (as defined under the principles of paragraph (f)(4) of this section).

Respondent contends that "intermediate cost objectives" distinguishes between property subject to and property not subject to section 263A. The cited language is less than clear, and the regulations do not expand on or define "intermediate cost objectives" other than to offer examples "such as departments or activities". However, when read in the context of the above-analyzed regulations, we find that the phrase "intermediate cost objectives" is not meant to distinguish between property subject to and property not subject to section 263A.

For the above reasons, we find that section 1.263A-1(g)(3), Income Tax Regs., does not require that the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., govern the first level allocation.

B. <u>The Language and Parallel Structure of Sections 1.263A-1 and 1.451-3, Income Tax Regs.</u>

Respondent argues that the parallel structure of sections 1.263A-1 and 1.451-3, Income Tax Regs., indicates that the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., should be incorporated into the undefined phrase "reasonable allocation" in sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs. However, respondent's argument is not supported by the actual structure of the regulations. In

trying to establish a reasonableness standard for the first level allocation, respondent collapses the two levels of allocation into one.

As discussed above, the regulations under both sections 263A and 451 provide for two levels of allocations. At the first level, section 1.263A-1(e)(3)(i), Income Tax Regs., provides that "Taxpayers subject to section 263A must make a reasonable allocation of indirect costs between production, resale, and other activities." Likewise, section 1.451-3(d)(6)(ii), Income Tax Regs., "[requires] a reasonable allocation between the portion of such costs that are attributable to * * * long-term contracts and the portion attributable to the other activities of the taxpayer." "Reasonable allocation" is not defined in either section. See secs. 1.263A-1(e)(3)(i), 1.451-3(d)(6)(ii), Income Tax Regs.

With respect to the second level allocation, section 1.263A-1(g)(3), Income Tax Regs., provides that the indirect costs of property produced or property acquired for resale be "allocated using either a specific identification method, a standard cost method, a burden rate method, or any other reasonable allocation method (as defined under the principles of paragraph (f)(4) of this section)." In relevant part, section 1.263A-1(f)(4), Income Tax Regs., states: "a taxpayer may use any other reasonable method to properly allocate direct and indirect costs <u>among units</u>

of property produced or property acquired for resale", and then sets forth a reasonableness standard. (Emphasis added.) As found above, section 1.263A-1(f)(4), Income Tax Regs., applies only to the second level allocation. Similarly, section 1.451-3(d)(8)(iv), Income Tax Regs., requires that indirect costs previously allocated to long-term contracts under paragraph (d)(6)(ii) shall be allocated to a particular long-term contract using a specific identification method, a burden rate method, "or similar formulas, so long as the method employed * * * reasonably allocates indirect costs". However, unlike section 1.263A-1(f)(4), Income Tax Regs., section 1.451-3(d)(8)(iv), Income Tax Regs., does not provide a reasonableness standard.

What respondent asks the Court to do is take the reasonableness standard from the second level allocation under the section 263A regulations and apply it to the first level allocation under the regulations of sections 263A and 460. While the regulations under both sections have a parallel structure, such structure works against respondent's interpretation. The regulations clearly separate the two levels of allocations, and as found above, the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., applies only to the second level allocation. The structure of the regulations supports limiting the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., to the second level allocation only.

In addition, the explicit language of section 1.263A-1(f)(4), Income Tax Regs., indicates that the reasonableness standard should not be read into section 1.451-3(d)(6)(ii), Income Tax Regs. The reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., can apply only when section 263A is at issue. Section 1.263A-1(f)(4), Income Tax Regs., cannot apply when only section 460 is at issue. The first of three prongs to the reasonableness standard states: "The total costs actually capitalized during the taxable year do not differ significantly". Sec. 1.263A-1(f)(4), Income Tax Regs. (emphasis added). While both sections 263A and 460 are at issue in the instant case, this will not always be so.

Section 1.451-3(c)(3), Income Tax Regs., requires that under the percentage of completion method, costs incurred during the taxable year with respect to a long-term contract must be deducted in that year. Again, section 1.451-3(d)(6)(ii), Income Tax Regs., requires that costs must be reasonably allocated among the taxpayer's long-term contracts and "other activities". In situations where the "other activities" are not subject to the capitalization requirements of section 263A, the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., cannot apply because no costs would "actually [be] capitalized". Thus, the reasonableness standard of section 1.263A-1(f)(4), Income Tax

Regs., cannot always be read into section 1.451-3(d)(6)(ii), Income Tax Regs., as respondent suggests.

For these reasons, the language and parallel structure of the regulations do not support incorporating the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., into the undefined phrase "reasonable allocation" in sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.

C.   Legislative History of Section 263A

Respondent maintains that the legislative history of section 263A indicates that the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., should be incorporated into sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.  Respondent asserts that "This incorporation is necessary to satisfy Congressional intent to provide a single comprehensive set of harmonious rules to govern the capitalization of costs of producing property".

The uniform capitalization rules of section 263A and the special rules for long-term contracts under section 460 were enacted as part of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085.  With regard to the uniform capitalization rules, the Senate report states:

> The Committee believes that, in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property * * *

subject to appropriate exceptions where application of the rules might be unduly burdensome.

*   *   *   *   *   *   *

The uniform capitalization rules will be patterned after the rules applicable to extended period long-term contracts, set forth in the final regulations issued under section 451. Accordingly, taxpayers subject to the rules will be required to capitalize not only direct costs but also an allocable portion of most indirect costs that benefit the assets produced or acquired for resale * * *. The committee recognizes that modifications of the rules set forth in the long-term contract regulations may be necessary or appropriate in order to adapt such rules to production not involving a contract, and intends that the Treasury Department will have the authority to make such modifications.

* * * The existing long-term contract regulations provide a large measure of flexibility to taxpayers in allocating indirect costs to contracts inasmuch as they permit any reasonable method of allocation authorized by cost accounting principles. The committee expects that the regulations under this provision will adopt a similarly liberal approach and permit allocations of costs among numerous items produced or held for resale by a taxpayer to be made on the basis of burden rates of other appropriate methods similar to those provided under present law.

S. Rept. 99-313, at 140-142 (1986), 1986-3 C.B. (Vol. 3) 1, 140-142. In less detail, the House report states: "allocations of indirect production costs among items produced, or between inventory and current expense, are to be made under rules similar to those provided under present law." H. Rept. 99-426, at 626 (1985), 1986-3 C.B. (Vol. 2) 1, 626.

The legislative history, as quoted above, clearly indicates that Congress intended the uniform capitalization rules to be

patterned after the regulations under section 451, taking a "similarly liberal approach".  See S. Rept. 99-313, supra at 141, 1986-3 C.B. (Vol. 3) at 141; H. Rept. 99-426, supra at 626, 1986-3 C.B. (Vol. 2) at 626.  Respondent argues that consequently, the definitions of section 1.263A-1(f)(4), Income Tax Regs., "and the principles of its detailed guidance for the allocation of costs should govern * * * the interpretation of 'reasonable method' under the section 451 regulations."  We interpret the legislative history differently.

The Senate report does not state that the regulations under sections 263A and 451 should be identical.  Nor does the Senate report state that the same rules should apply to allocations under the two sections.  The Senate report provides only that the uniform capitalization rules be "patterned" after the section 451 regulations, and it explicitly acknowledges that changes may be needed "in order to adapt such rules to production not involving a [long-term] contract".  The Senate report suggests that Congress knew differences existed between allocations under sections 263A and 451, and thus different rules would be required.

Respondent further contends that, by not incorporating the reasonableness standard of the section 263A regulations into the section 451 regulations, the "choice" of which Code section to apply first "will lead to radically different results," thus

violating Congress's "intent of harmony between the two Code sections." Respondent is presumably focusing on the language of the Senate report that "in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property". S. Rept. 99-313, supra at 140, 1986-3 C.B. (Vol. 3) at 140. This argument is unpersuasive. As found above, the rules for the first level allocations under both sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs., are identical, requiring only that a "reasonable allocation" be made. The two sections can be applied simultaneously and will end with the same result under the first level allocation, regardless of which section the taxpayer focuses on.

Accordingly, we find that the legislative history does not support incorporating the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., into the first level allocations under sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.

D.   The Ordinary Meaning of Reasonable

Where a term is not defined in a statute, it should be given its ordinary meaning. Crane v. Commissioner, 331 U.S. 1, 6 (1947); Keene v. Commissioner, 121 T.C. 8, 14 (2003); De Cou v. Commissioner, 103 T.C. 80, 87 (1994); Goodson-Todman Enters.,

LTD. v. Commissioner, 84 T.C. 255, 277 (1985).  When there is no indication that Congress intended the term to have a specific meaning, courts may look to sources such as dictionaries for a definition.  Keene v. Commissioner, supra at 14-15.

Respondent argues that the dictionary meaning of "reasonable" should not be used because section 1.263A-1(f)(4), Income Tax Regs., offers specific guidance as to its meaning.  However, as discussed above, the legislative history does not suggest that Congress intended the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., to apply to section 1.263A-1(e)(3)(i) or 1.451-3(d)(6)(ii), Income Tax Regs.  Therefore, we find that the term "reasonable" is not defined for purposes of sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs., and we may look to the dictionary definition of the term to give it its ordinary meaning.

"Reasonable" is defined as "being in agreement with right thinking or right judgment: not conflicting with reason * * * possessing good sound judgment".  Webster's Third New International Dictionary 1892 (1993).  In other words, something is reasonable if there is a  logic to it and a sound basis and justification for it.  Because it is undefined in sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs., we give "reasonable" this meaning in interpreting the phrase "reasonable allocation".  Accordingly, Qwest's incremental cost

allocation method will be a "reasonable allocation" method if there is a logic to it and a sound basis and justification for it.

### III. The Reasonableness of Qwest's Incremental Cost Allocation Method

Respondent determined that Qwest's incremental cost allocation method is unreasonable. In support of this determination, respondent argues that Qwest's incremental cost allocation method: (1) Does not meet the reasonableness standard found in section 1.263A-1(f)(4), Income Tax Regs.; (2) is inconsistent with the congressional objective of preventing distortion in the organization of economic activity; and (3) is inconsistent with the Supreme Court's requirement of taxpayer parity. Petitioners contend that Qwest's incremental cost allocation method is the most reasonable method because it reflected the economic reality of the transactions.

Generally, a taxpayer bears the burden of proving the Commissioner's determinations incorrect. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).[24] Respondent determined that Qwest's cost allocation method was unreasonable, and petitioners bear the burden of proving this determination incorrect.

---

[24] Under sec. 7491(a), the burden of proof may shift to the Commissioner in certain situations. Petitioners do not argue that the burden shifts to respondent.

A.    The Reasonableness Standard of Section 1.263A-1(f)(4), Income Tax Regs.

As found above, the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., only applies to second level allocations.  The issue in the instant case is whether Qwest's first level allocations, i.e., those between property produced under its customer contracts and its retained assets, were reasonable.  Therefore, the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., is irrelevant in determining whether Qwest's incremental cost allocation method is reasonable.

B.    Distortion in the Organization of Economic Activity

Respondent contends that Qwest's incremental cost allocation method fails to match Qwest's income and expenses, resulting in dramatic tax deferral, and is thus unreasonable because it violates congressional intent.  Respondent's argument is based on hindsight, not on the facts as they were at the time Qwest made its allocations, and is thus unpersuasive.

The Senate report accompanying the Tax Reform Act of 1986 states:

> The committee believes that present-law rules regarding the capitalization of costs incurred in producing property are deficient in two respects. * * * Second, different capitalization rules may apply under the present law depending on the nature of the property and its intended use.  These differences may create distortions in the allocation of economic resources and the manner in which certain economic activity is organized.

The Committee believes that, in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property * * * subject to appropriate exceptions where application of the rules might be unduly burdensome.

S. Rept. 99-313, supra at 140, 1986-3 C.B. (Vol. 3) at 140. The concern expressed in the Senate report is that taxpayers can structure their economic activity in such a way that creates a mismatch of income and expenses. Respondent suggests that Qwest's goal in using its incremental cost allocation method was to create such a mismatch.

As an example, in the MCI Denver-El Paso project, Qwest allocated $30,422 per conduit mile to the customer contract, while allocating only $6,500 per conduit mile to the retained conduit. Respondent contends that Qwest knew its retained conduit was worth at least $30,000 to $40,000 per conduit mile, but Qwest intentionally allocated a disproportionate amount of expenses to the single conduit laid pursuant to a customer contract. Because more expenses were allocated to the customer's conduit, respondent contends that Qwest's income was understated when Qwest reported its income on the percentage of completion basis under section 460. Also, fewer expenses had to be capitalized under section 263A. The result was that Qwest was able to take advantage of the expense deductions up front and

delayed the recognition of income until the retained conduits were later sold.

Respondent's contention assumes that Qwest knew the amount of future economic benefit it would realize from the retained conduits at the time it made the cost allocations. Respondent focuses on Qwest's 1995 five-year plan, which stated Qwest's goal of offering 15,502 miles of conduit for sale to third-party customers. The 1995 five-year plan estimated that, if the conduit were sold at an average of $30,000 per conduit mile, this would generate revenue of $465 million. Respondent also notes that after the years in issue, Qwest was able to sell most of its retained conduits.

Respondent fails to consider the extensive testimony and evidence that, at the time the allocations were made, the value of the retained conduits was uncertain. The estimated value of the retained conduits at $30,000 per mile could be realized only if the conduits were actually sold. At the time of installation, Qwest did not have customers lined up to purchase the retained conduits. In its report to Qwest, CLC concluded that the country did not need another nationwide fiberoptic network, and Qwest's installation of additional conduits would be "very risky" and its revenue projections "may be optimistic". Further, Mr. Anschutz and Mr. O'Callaghan credibly testified that installing additional

conduit was speculative and Qwest knew that the retained conduit could potentially have little or no value.

Respondent's accounting expert, Professor Charlotte Wright (Professor Wright), testified:

> the question put to me was, Would an incremental cost accounting method * * * present a true and fair view of the results of operations during the current period.
>
> And then since these would be--capitalize future economic performance, it concerned me that a method that resulted in only minor costs--a minor amount of costs being capitalized * * * would result in an understatement of their assets in the current period and then, going forward, an overstatement for financial reporting of their profits in the future * * *.

However, Professor Wright concluded that "if there was a genuine concern that you would never recover an allocated portion of the total costs, then a method that allocated less to the retained assets, such as an incremental method, would be appropriate."

Petitioners firmly established that the value of Qwest's retained conduits was uncertain when the cost allocations were made. Respondent's expert testified that when the future economic benefit of a retained asset is uncertain, a method that allocates less expense to that asset may be appropriate. Accordingly, we find that Qwest's incremental cost allocation method was not used to distort the organization of economic activity and does not violate congressional intent.

C.   Taxpayer Parity

Respondent argues that Qwest's incremental cost allocation method is unreasonable because it violates the principles of taxpayer parity as required by the Supreme Court in Idaho Power Co. v. Commissioner, 418 U.S. 1 (1974).  Respondent states:

> Because Qwest is simultaneously constructing identical assets for itself and for customers, Qwest's incremental method must also satisfy the * * * taxpayer parity standards set forth in Idaho Power.  By failing to do so, Qwest's incremental method results in an unfair competitive advantage for Qwest compared to its competitors, a result contrary to the guidance of Idaho Power.

Respondent misinterprets Idaho Power Co., and thus the argument is unpersuasive.

In Idaho Power Co. v. Commissioner, supra, the taxpayer capitalized depreciable operating and maintenance costs of transportation equipment used in constructing its capital facilities on its books, but for Federal income tax purposes, it claimed the depreciation as current expense deductions under section 167(a).  Id. at 5-6.  The Commissioner disallowed the construction-related depreciation deduction, determining that depreciation was in that context a nondeductible capital expenditure to which section 263(a)(1) applied.  Id. at 6.  The Supreme Court upheld the Commissioner's determination, and emphasized the importance of matching income with expenses by capitalizing costs incurred in the construction of capital assets

over those assets' useful lives.  Id. at 11-14.  The Supreme

Court also stated:

> An additional pertinent factor is that capitalization
> of construction-related depreciation by the taxpayer
> who does its own construction work maintains tax parity
> with the taxpayer who has its construction work done by
> an independent contractor.  The depreciation on the
> contractor's equipment incurred during the performance
> of the job will be an element of cost charged by the
> contractor for his construction services, and the
> entire cost, of course, must be capitalized by the
> taxpayer having the construction work performed.  The
> Court of Appeals' holding [that the taxpayer could
> currently deduct the depreciation expense] would lead
> to disparate treatment among taxpayers because it would
> allow the firm with sufficient resources to construct
> its own facilities and to obtain a current deduction,
> whereas another firm without such resources would be
> required to capitalize its entire cost including
> deprecation charged to it by the contractor.

Id. at 14.  To clarify, the Supreme Court was concerned that the

tax treatment of construction-related depreciation should be the

same between:  (1) A taxpayer who constructs its own capital

asset; and (2) a taxpayer who hires a contractor to construct a

capital asset, and thus bears the burden of that depreciation

through the price charged by the contractor for his construction

services.

Respondent attempts to extend the tax parity rationale of

Idaho Power Co. v. Commissioner, supra, beyond what the Supreme

Court intended.  Using the MCI Denver-El Paso conduit

installation project as an example, respondent states:

> Qwest * * * had available for its own use or future
> sale to other customers three buried conduits compared
> to MCI's one identical conduit on the Denver to El Paso

route.  Under its method, Qwest's tax basis per conduit mile in each of its three conduits is $6,967 (including capitalized interest).  MCI, on the other hand, paid Qwest approximately $32 million for its one conduit that covered 761 miles * * *.  So MCI's tax basis per mile in the identical asset is $41,694.  This is six times Qwest's basis for the identical asset.

* * * * * * *

This huge disparity in tax basis of identical assets between Qwest's assets and those of its customers results in Qwest having an enormous competitive advantage in the industry.  With this situation, Qwest is in a position to either price its services lower than its competitors, to the competitors' detriment, or to reap a much higher percentage profit than its competitors for providing identical services. * * * such a situation violates the basic principle of taxpayer parity as espoused by the Supreme Court in Idaho Power and is a powerful indication of the unreasonableness of Qwest's incremental method * * * .

Idaho Power Co. v. Commissioner, supra, does not stand for the proposition that taxpayers' bases in identical property should be the same, nor does it stand for the elimination of the competitive advantage a taxpayer may have by constructing its own capital assets.

The principle of taxpayer parity found in Idaho Power Co. v. Commissioner, supra, is not the same as competitive equality. Qwest's competitive advantage did not arise from the use of its incremental cost allocation method, but was a function of its business model and of the resources it had available.  We find that Qwest's incremental cost allocation method does not violate the principle of taxpayer parity.

D.   Economic Reality of Qwest's Conduit Installation
     and Fiber Pulling Projects

Petitioners argue that Qwest's incremental cost allocation method is reasonable because it reflected Qwest's decision-making process and was based on the economic reality of the transactions.  However, respondent contends that Qwest's incremental cost allocation method did not accurately reflect its business strategy.

1.   Respondent's Characterization of Qwest's Business
     Strategy

Respondent argues that Qwest's business strategy during the years in issue was to become a full-service telecommunications company, and that obtaining third-party contracts was simply a means of financing the building of a nationwide fiberoptic network.  Respondent cites Qwest's 1995 five-year plan, which states:  "The primary business focus of [Qwest] is to create a nationwide, owned, facility based network and utilize it to carry profitable, revenue traffic."  Respondent asserts that the other transactions during the years in issue support respondent's characterization.  Respondent also notes that Qwest offered telecommunications services during the years in issue. Respondent's argument is based in large part on hindsight, as it looks at the development of Qwest subsequent to the years in issue, not as Qwest was operating during the years in issue.

No five-year plans were ever adopted by Qwest's Board of Directors. Further, Mr. Anschutz, Mr. O'Callaghan, Mr. Pearce, and other witnesses credibly testified that Qwest's goal during the years in issue was not to become a full-service telecommunications company. Mr. Anschutz testified that "Our intent was to make contracts with buyers for segments of construction along the railroad and, if we could, to make money on those contracts for construction and, in the process, lay incremental conduit, or in some case fiber, as we went." While many of Qwest's other transactions indicate that Qwest's business was expanding during the years in issue, these transactions do not contradict the witnesses's testimony. Many of the transactions were entered into to service Qwest's existing telecommunications service customers. When questioned about the telecommunications services offered during the years in issue, Mr. Anschutz explained that those services were "an experiment during the years in issue--yes there were substantial revenues, but even larger losses, and that's why the experiment was shut down."

It is not clear from respondent's argument how, if we were to accept his characterization of Qwest's business strategy, this would impact the reasonableness of Qwest's incremental cost allocation method. Presumably, it would cast doubt on petitioners' characterization of the economic reality of their

transactions or on the amount of costs allocated to Qwest's retained conduits. Nevertheless, for the above-stated reasons, we do not accept respondent's characterization of Qwest's business strategy.

2. Petitioners' Characterization of Qwest's Transactions and Decision-Making Process

Petitioners contend that Qwest's incremental cost allocation method reflected Qwest's decision-making process and the economic reality of the underlying transactions. Specifically, petitioners state:

> Under its long-term customer contracts, Qwest obligated itself to incur costs to satisfy its contractual obligations, and then decided whether to make the incremental investment necessary to install additional empty conduits or fibers. In other words, Qwest's basic approach was to get a customer to pay enough to justify installing and selling the conduit the customer wanted, and then to consider whether to incur the limited incremental risk of installing additional conduit for its own potential future use or sale. * * * Qwest's cost allocation was entirely consistent with its business strategy.

As discussed below, respondent argues that several facts contradict petitioners' characterization.

a. General Procedure Followed by Qwest

The parties stipulated that Qwest generally followed the same procedure in its conduit installation projects: (1) Qwest contracted with a third-party customer for installation of conduit over a certain route; (2) conduit was installed along Southern Pacific's or other railroad companies' rights-of-way;

(3) Qwest received cash compensation or DS-3 capacity for installing the conduit; and (4) Qwest simultaneously installed and retained additional conduits for its own potential future use or sale. With respect to the IRU projects, Qwest: (1) Contracted with WorldCom to pull a certain number of fibers; and (2) instead of pulling a fiberoptic cable with just enough fibers to satisfy the IRU agreement, Qwest pulled a fiberoptic cable with additional fibers for its own potential future use or sale.

### b. Qwest's Primary Focus

Petitioners argue that Qwest would not have installed the additional conduits or pulled additional fiber without first having the third-party customer contracts in place. Respondent argues that Qwest's primary focus was not the installation of conduit or pulling of fiber for third-party customers, pointing to the two projects with no third-party customer contracts in place.[25]

During the years in issue, Qwest engaged in nine conduit installation projects for third-party customers[26] and three IRU projects for WorldCom. In each instance, Qwest made the decision

---

[25] It is important to note that the cost allocations with respect to these two projects are not at issue; respondent only uses them to question Qwest's incremental cost allocation method utilized in the projects in issue.

[26] As noted supra, Qwest actually engaged in 12 such conduit installation projects, but only 9 of these projects are still in issue.

to install additional conduit or pull additional fiber only after the customer contract was entered into.  Petitioners' witnesses credibly testified that Qwest would not have installed conduit or pulled fiber for its own potential future use or sale without the third-party customer contracts.  The Cal Fiber project and the Dallas-Houston Project do not cast doubt on this decision-making approach.

In the Cal Fiber project, Qwest linked unconnected segments of empty conduit that were previously installed and retained by Qwest as part of the Coast Route Project.  As part of the Cal Fiber project, Qwest laid 153 new miles of conduit to complete a fiberoptic system from Roseville, California, to Los Angeles, California.  The Coast Route project was the first project in which Qwest simultaneously installed conduits for third-party customers and multiple conduits for its own potential future use or sale.  As a result of the Coast Route project, Qwest obtained several unconnected segments of empty conduit along the Coast Route.  Petitioners argue that installing conduit to connect these segments was not a departure from Qwest's normal business strategy because Qwest was installing only small portions of conduit to connect a much bigger system of conduits.  The cost was relatively modest, and Qwest took the risk because a connected fiberoptic system could potentially have a much higher value.

In the Dallas-Houston project, Qwest installed 270 miles of conduit, pulled fiber, and lit the fiber without a third-party contract in place. Petitioners explain that this was not a departure from Qwest's normal business strategy because Qwest began construction only after management assured Mr. Anschutz that WilTel would purchase the conduit. Subsequently, WilTel purchased the Dallas-Houston conduit system.

The Cal Fiber and Dallas-Houston projects were departures from Qwest's general conduit installation and fiber-pulling procedures. However, the significance respondent attaches to the departures is not justified. The testimony shows that the projects were consistent with Qwest's overall business strategy of installing conduit or pulling fiber only when the risk of doing so could be limited. These projects do not suggest that Qwest's primary focus in the projects at issue was its retained assets rather than the conduit installed or fiber pulled for the third-party customer, as respondent contends.

Accordingly, we find that Qwest's primary focus in its nine conduit installation projects and three IRU projects was the third-party customer contracts. But for the existence of the third-party contracts, Qwest would not have installed additional conduit or pulled additional fiber.

c. Allocation of Costs Necessary to Complete the Third-Party Customer Contracts to Those Contracts

Because certain costs were necessary to complete the third-party customer contracts, regardless of how many additional conduits or fiber were installed or pulled, Qwest allocated those costs to third-party customer contracts. Petitioners argue that this is consistent with the economic reality of the transactions because Qwest would not have incurred the costs absent the customer contract. Respondent recognizes that Qwest had to incur certain fixed costs regardless of whether one conduit is installed (or a 24-fiber cable is pulled), or multiple conduits are installed (or a cable with more than 24 fibers is pulled) simultaneously. However, respondent argues that a portion of the fixed costs, such as the costs of digging a trench and the costs associated with perfecting Qwest's rights-of-way, should also be allocated to the retained assets because those costs also benefit the retained assets. Further, respondent argues that a portion of cost adjustments based on terrain and budget overruns should also be allocated to Qwest's retained assets.

As found above, Qwest would not have installed additional conduit or pulled additional fiber without first securing the customer contract. Accordingly, we find that Qwest's allocation of those costs to only the customer contract was consistent with

Qwest's decision-making process and the economic reality of the transactions.

> d. Allocation of Incremental Costs to Qwest's Retained Assets

Qwest allocated only the direct costs of material and an incremental portion of labor and indirect costs to its retained conduits. With respect to the retained fiber, Qwest allocated only the incremental costs of installing any additional conduits and endlinks and the costs of the retained fiber and of splicing and testing that fiber. Petitioners argue that the allocation of these costs is consistent with the economic reality of the transactions because these costs were the only additional costs incurred by Qwest as a result of its decision to install additional conduit or pull additional fiber. Further, petitioners argue that the allocation also reflected Qwest's willingness to incur only an incremental risk by installing the retained assets. Respondent does not contest that at least these costs should be allocated to Qwest's retained assets. However, respondent questions how Qwest arrived at its incremental base rate.

Before the years in issue, Qwest acted primarily as a general contractor and subcontracted most of the construction work out to third parties. Bids submitted by subcontractors to install only one conduit, when compared to the bids to install multiple conduits, indicated that the third-party subcontractors

increased their bid on an incremental basis when more conduits were added.  Qwest used this idea as the foundation for its incremental cost allocation method and the development of its incremental base rate.

Mr. O'Callaghan and Mr. Pearce developed an incremental base rate of $6,019 per conduit mile.  The incremental base rate included:  (1) $2,376 for conduit material, assuming a cost to Qwest of 45 cents per foot; (2) $370 for other material related to installation; (3) $2,640 for labor attributable to the installation of the additional conduit; (4) $581 for equipment costs; and (5) $53 for overhead.  The incremental base rate did not include costs such as those for of digging the trench or for perfecting the rights-of-way, nor was it adjusted to reflect cost increases based on terrain or budget overruns.

First, respondent questions the development of the incremental base rate, implying that Qwest arbitrarily arrived at $6,019.  Mr. O'Callaghan and Mr. Pearce testified that they looked at all costs associated with the installation of conduit to determine what costs were fixed and what costs increased when more conduits were added.  They then looked at the costs that increased, such as labor, equipment costs, and overhead, and came up with the average cost increase per conduit mile when additional conduits were installed.  To this figure, they added the average cost of conduit material to arrive at $6,019.  Mr.

Pearce testified that their calculations were reflected on spreadsheets on his laptop computer, and when he retired in 1999, he returned the computer to Qwest. Qwest could not find the spreadsheets. Despite the missing underlying spreadsheets, we find that Mr. O'Callaghan and Mr. Pearce credibly justified Qwest's use of an incremental base rate of $6,019.

Respondent also questions why the incremental base rate did not include the costs of digging the trench, costs associated with perfecting rights-of-way, and why the base rate was not adjusted to reflect cost increases based on terrain or budget overruns. However, respondent recognizes that Qwest had to incur these costs regardless of whether one conduit or multiple conduits were installed. As found above, because Qwest was obligated to incur these costs to perform its customer contracts, allocating all of these costs to the customer contracts reflects the economic reality of the projects.

Because Qwest incurred only certain incremental costs to install additional conduit or pull additional fiber, and because Qwest was willing to incur only limited risk to do so, we find that Qwest's allocation of only those costs to its retained assets was consistent with Qwest's decision-making process and the economic reality of the transactions.

e.    Summary

With regard to the projects in issue, petitioners have shown that Qwest would not have installed additional conduit or pulled additional fiber without first securing a customer contract. Qwest's allocation of all costs necessary to complete the customer contract to that contract is consistent with Qwest's business strategy.  Qwest's allocation of the incremental costs to its retained assets reflects the risk involved with and the incremental cost of installing those assets.  For these reasons, we find that Qwest's incremental cost allocation method is consistent with its business strategy because it reflects Qwest's decision-making process and the economic reality of the projects at issue.

3.    Expert Testimony

Petitioners' cost accounting expert, Professor Charles E. Horngren (Professor Horngren), is the Edmund W. Littlefield Professor of Accounting, Emeritus, at Stanford University.  He has been a professor for more than 37 years and his cost accounting treatise, originally published in 1962, is currently in its 12th edition.  In Professor Horngren's expert opinion, when costs are allocated consistently with one's business strategy, the allocations are reasonable.  In his expert report, Professor Horngren explains:

> The basic Qwest idea was to get a customer who
> pays enough to justify installing and selling one

conduit.  Without that customer, investments in additional retained conduits are too great in amount, particularly when the potential benefit is so risky. * * * On the other hand, the incremental expected costs are sufficiently low to warrant accepting the risks. In short, the business strategy is buttressed by cost allocations that encourage prudent risk-taking. * * *
        Because its cost allocations harmonized with sound business strategy, Qwest adopted a reasonable allocation method.

Professor Horngren's expert testimony strongly supports the reasonableness of Qwest's incremental cost allocation method.

Professor Wright, respondent's accounting expert, did not conclude that Qwest's incremental cost allocation method was unreasonable.[27]  As described above, Professor Wright testified that if the future economic value of the retained property is uncertain, an incremental cost allocation method may be appropriate.  Because petitioners have established that the value of Qwest's retained conduit was uncertain, Professor Wright's testimony also supports the reasonableness of Qwest's incremental cost allocation method.

        4.  Conclusion

Because Qwest's incremental cost allocation method was based on the economic reality of the projects in issue, consistent with its decision-making process, and supported by expert testimony, we find that there was a logic to it and a sound basis and

_____

[27]  Respondent also introduced the expert report of John C. Donovan.  However, Mr. Donovan's report focused largely on FCC regulations that were not applicable to the years in issue.  For this reason, we did not consider his report.

justification for it.  Petitioners have met their burden of proof.  Therefore, we hold that Qwest's incremental cost allocation method is a reasonable allocation method for purposes of sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.

IV.  Clear Reflection of Income and Respondent's Average Cost Allocation Method

Respondent argues that under section 446(b), respondent may change Qwest's method of accounting to an average cost allocation method.  Respondent's sole basis for this position is that, because Qwest's incremental cost allocation method fails to meet the reasonableness requirement of section 1.263A-1(f)(4) and (g)(3), Income Tax Regs., Qwest's method of accounting does not clearly reflect income.

Under section 446(a), a taxpayer may compute its taxable income under the method of accounting it regularly uses to compute its income in keeping its books.  However, section 446(b) vests the Commissioner with broad discretion to change the taxpayer's method of accounting if he determines that the taxpayer's particular method of accounting fails to clearly reflect income.  Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979); Brown v. Helvering, 291 U.S. 193, 203 (1934); Bank One Corp. v. Commissioner, 120 T.C. 174, 287-288 (2003); Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 370 (1995); see also sec. 1.446-1(a)(2), Income Tax Regs.

Generally, the Commissioner's determination under section 446(b) is to be respected unless it is found to be an abuse of discretion.  Exxon Mobile Corp. v. Commissioner, 114 T.C. 293, 324 (2000); Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371.  In reviewing the Commissioner's determination, the function of the Court is to determine whether there is an adequate basis in law for the Commissioner's conclusion.  RCA Corp. v. United States, 664 F.2d 881, 886 (2d Cir. 1981); Ansley-Sheppard-Burgess Co. v. Commissioner, supra at 371.  Finding that the Commissioner abused his discretion under section 446(b) is not preconditioned on finding that the taxpayer's method clearly reflects income. See Bank One Corp. v. Commissioner, supra at 289.

Section 1.263A-1(g)(3), Income Tax Regs., does not require that the reasonableness standard of section 1.263A-1(f)(4), Income Tax Regs., be applied to first level cost allocations under sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.  As held above, Qwest's incremental cost allocation method is a reasonable allocation method for purposes of sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.  For these reasons, respondent's sole basis for arguing that Qwest's method of accounting does not clearly reflect income necessarily fails.  Respondent's determination that Qwest's incremental cost allocation method fails to clearly reflect income does not have an adequate basis in the law.  Therefore, we hold that respondent

abused his discretion and may not change Qwest's incremental cost allocation method to an average cost allocation method under section 446(b).

V.   Conclusion

Petitioners have met their burden of proving that Qwest's incremental cost allocation method is a reasonable allocation method for purposes of sections 1.263A-1(e)(3)(i) and 1.451-3(d)(6)(ii), Income Tax Regs.  Additionally, respondent's determination that Qwest's incremental cost allocation method failed to clearly reflect income was an abuse of discretion, and thus respondent may not change Qwest's method to an average cost method.

In reaching our holdings, we have considered all arguments and contentions made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

Decision will be

entered under Rule 155.