# United States Tax Court

162 T.C. No. 3

23RD CHELSEA ASSOCIATES, L.L.C., RELATED 23RD CHELSEA
ASSOCIATES, L.L.C., TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 22382-19.                                    Filed February 20, 2024.

————

C, a partnership, constructed a residential rental property in New York City during 2001 and 2002. Construction was financed by a loan from the New York State Housing Finance Agency (HFA). The HFA funded the loan by raising $110 million in bonds, some of which were tax exempt under I.R.C. § 103. C claimed low-income housing credits (LIHCs) under I.R.C. § 42 for tax years 2003 through at least 2009. In calculating the yearly credit, C included in the property's "eligible basis" (as defined in I.R.C. § 42(d)) a portion of the various financing costs it incurred in connection with the HFA loan, including bond fees that the HFA passed on to C.

In a notice of final partnership administrative adjustment for tax year 2009, R determined that C should not have included any of the financing costs in eligible basis. R accordingly proposed to reduce C's LIHC for tax year 2009 and also proposed an increase in tax under the credit recapture provisions of I.R.C. § 42(j) with respect to tax years 2003–08.

*Held*: The term "adjusted basis" in I.R.C. § 42(d)(1) has the meaning given to it in I.R.C. § 1011(a), and

accordingly the uniform capitalization rules of I.R.C. § 263A apply.

*Held, further*, all financing costs, including bond fees, incurred "by reason of" the taxpayer's construction of residential rental property, *see* Treas. Reg. § 1.263A-1(e)(3)(i), and before the end of the first year of the credit period, *see* I.R.C. § 42(d)(1), are includible in eligible basis for purposes of the LIHC. This is true whether or not the bondholders are exempt from federal income tax under I.R.C. § 103 on the bond interest.

*Held, further*, R's proposed adjustments are not sustained.

————————

*James P. Dawson* and *Alan S. Cohen*, for petitioner.

*Frederick C. Mutter* and *Mimi M. Wong*, for respondent.

OPINION

COPELAND, *Judge*: On September 30, 2019, the Commissioner of Internal Revenue (Commissioner) issued a notice of final partnership administrative adjustment (FPAA) for tax year 2009 to Petitioner, Related 23rd Chelsea Associates, L.L.C., the tax matters partner (TMP) for 23rd Chelsea Associates, L.L.C. (23rd Chelsea). This case is a partnership-level action under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA),[1] based on a timely Petition filed by the TMP. In the FPAA the Commissioner determined that 23rd Chelsea overstated the "eligible basis" of its residential rental property for purposes of the section 42 low-income housing credit (LIHC). *See* I.R.C. § 42(d)(1). Accordingly, the Commissioner proposed decreasing the LIHC credit amount claimed by 23rd Chelsea for tax year 2009 by $20,079 (i.e., the

---

[1] TEFRA, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, codified at sections 6221 through 6234, was repealed for returns filed for partnership tax years beginning after December 31, 2017. Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

amount allocable to the alleged overstatement of eligible basis). The Commissioner also proposed a recapture amount of $49,568, reflecting the portion of the credits claimed in tax years 2003 through 2008 allocable to the alleged overstatement. *See* I.R.C. § 42(j).

The parties submitted this case fully stipulated for decision without trial, pursuant to Rule 122. After concessions by the Commissioner (as described below), the issues for our decision are (1) whether, for purposes of the LIHC, the eligible basis in a qualified low-income residential building includes financing costs[2] related to the issuance of bonds (whether taxable or tax-exempt)[3] whose proceeds were lent to the taxpayer as financing for the construction of the building and (2) if not, whether section 42(j) requires a credit recapture from the taxpayer that included such financing costs in its eligible basis in prior tax years. These are questions of first impression for our Court.

*Background*

The following facts are based on the pleadings and the parties' First Stipulation of Facts, including the attached Exhibits. Both 23rd Chelsea and the TMP are Delaware limited liability companies with a principal place of business in New York, New York.

I. *Building Construction*

23rd Chelsea was formed on June 6, 2000. Between June 2000 and March 2001, 23rd Chelsea purchased real property and development rights on West 23rd Street, New York, New York. On or about June 1, 2001, 23rd Chelsea began construction to develop the property into a 313-unit[4] multifamily residential apartment complex called the Tate, including recreational facilities, a business center, and

---

[2] The parties refer to the financing costs included in 23rd Chelsea's calculation of eligible basis as "bond fees." However, that calculation includes costs not directly related to the bonds (e.g., loan issuance costs), so for clarity this Opinion refers to such costs collectively as "financing costs."

[3] Hereinafter, bonds whose interest payments are not taxable to the bondholders under section 103 are referred to as "tax-exempt bonds," and bonds whose interest payments are not excludable under section 103 are referred to as "taxable bonds."

[4] There is some evidence in the record that 314, rather than 313, units were constructed. This discrepancy does not affect our disposition of the case.

retail space. Construction lasted approximately 14 months, and the Tate was placed in service on August 13, 2002.

The Tate's construction was funded entirely by a 31.5-year, $110 million loan from the New York State Housing Finance Agency (HFA). The HFA raised these funds through two bond issuances, the first on May 31, 2001, composed of 31.5-year bonds, and the second on July 1, 2002, composed of 30.4-year bonds. The 2001 issuance comprised $26 million of tax-exempt bonds and $27.5 million of taxable bonds. The 2002 issuance comprised $73 million of tax-exempt bonds. Of the proceeds from the 2002 issuance, $16.5 million was used to redeem a portion of the outstanding 2001 taxable bonds, and the rest was remitted to 23rd Chelsea.

As a condition of initiating the loan, the HFA required 23rd Chelsea to agree to certain restrictions on the eventual tenant mix (by income level) and the rental rates for low-income tenants. These restrictions were designed to (among other things) preserve the tax-exempt status of the tax-exempt bonds and qualify the Tate for the LIHC. The HFA also required 23rd Chelsea to fully secure the loan and related repayment obligations by obtaining a letter of credit from Bayerische Hypo-und Vereinsbank AG (Hypo Bank) (or another bank acceptable to the HFA). 23rd Chelsea duly obtained a letter of credit from Hypo Bank, which agreed to lend 23rd Chelsea up to $54.1 million between May 31, 2001, and May 31, 2006, solely for the purpose of making principal or interest payments on the loan financed by the HFA's 2001 bond issuance. A subsequent letter of credit from Hypo Bank, dated July 1, 2002, increased 23rd Chelsea's credit limit to $111.2 million (to also reflect the 2002 bond issuance). 23rd Chelsea never drew on either letter of credit.

Of the $110 million of bond proceeds ultimately lent to 23rd Chelsea, it spent $107,444,441 by December 31, 2003, including $5,745,837 in financing costs stemming from the bond issuances.

II.    *Calculation of Eligible Basis*

23rd Chelsea claimed an LIHC with respect to the Tate of $593,961 in each tax year from 2003 through at least 2009. *See infra* note 10. The partnership calculated this credit using an eligible basis (as defined in section 42(d)) of $93,165,121, determined as follows: $60,792,972 of "hard" construction costs (including material and labor for concrete, masonry, plumbing, electrical, etc.); $1,218,320 of financing

costs; $9,654,186 of other "soft" costs (architecture and engineering fees, insurance payments, etc.); and a 30% increase pursuant to section 42(d)(5)(C),[5] which increases the LIHC for buildings in areas with a high concentration of low-income residents or a high poverty rate, *see* § 42(d)(5)(C)(ii), or high construction, land, and utility costs, *see* § 42(d)(5)(C)(iii). The Tate's hard costs included $1,204,362 of union dues and pension contributions, paid by 23rd Chelsea on behalf of workers for one of its construction subcontractors.

The financing costs consisted of the following components and amounts:

| *Component* | *Description* | *Total Amount* | *Amount Included by 23rd Chelsea in Eligible Basis* |
|---|---|---|---|
| Origination Fee | Paid to Hypo Bank in connection with letter of credit | $841,696 | $193,232 |
| HFA Financing Fee | Paid to HFA in connection with loan agreement | 880,000 | 26,789 |
| NYS Bond Fee | Paid to New York State Department of Taxation, on HFA's behalf, in connection with bond issuances | 698,250 | 16,524 |
| Rating Agency Fee | Paid to reimburse HFA for obtaining bond ratings | 3,000 | 55 |
| Multi-Year Processing Fee | Paid to HFA in connection with loan agreement | 25,000 | 956 |
| Underwriter Fee | Paid to bank that underwrote and remarketed the bonds | 253,000 | 6,768 |
| Underwriter Expenses | Paid to reimburse underwriting bank for expenses | 17,109 | 461 |
| Trustee Fee | Paid to reimburse HFA for bond trustee's fee | 7,000 | 128 |
| Printing and Binding Costs | Paid to reimburse HFA for producing bond documents | 6,000 | 110 |

---

[5] This citation is given for tax year 2003, the first year of the Tate's credit period. The provision is currently codified at section 42(d)(5)(B).

| | | | |
|---|---|---|---|
| Hypo Bank Servicing Fee | Paid to Hypo Bank in connection with letter of credit | 81,200 | 79,892 |
| HFA Servicing Fee | Paid to HFA in connection with loan agreement | 75,793 | 74,572 |
| HFA Application Fee | Paid to HFA in connection with loan agreement | 60,000 | 2,295 |
| Engineer Consultants Cost | Paid to engineers retained by Hypo Bank and HFA in connection with letter of credit | 113,574 | 111,744 |
| Appraisal Fee | Paid to Hypo Bank in connection with letter of credit | 17,500 | 4,017 |
| Financial Adviser Fees | Paid to reimburse HFA and Hypo Bank for financial adviser fees | 30,000 | 4,018 |
| Letter of Credit Commitment Fee | Paid to Hypo Bank in consideration for its extending the letter of credit | 693,000 | 681,835 |
| Guaranty Fee | Paid in connection with a guaranty, required by Hypo Bank and made by a company related to 23rd Chelsea, of any draws on Hypo Bank's letter of credit | 77,000 | — |
| Title Insurance | Paid to title insurer engaged for bond issuances | 390,024 | 14,924 |
| Refinancing Costs | Paid in connection with refinancing the HFA loan in 2003 | 1,476,691 | — |
| **Totals** | — | **$5,745,837** | **$1,218,320** |

The parties stipulated that 23rd Chelsea incurred the amounts shown in the "Total Amount" column for the purposes listed in the "Description" column (i.e., the parties agreed that the fees and expenses listed in the table were 23rd Chelsea's financing costs incurred related to the issuance of the HFA bonds that funded 23rd Chelsea's loan).

The HFA either directly or indirectly required 23rd Chelsea to pay each component of the financing costs—other than the Refinancing Costs—as a condition of the HFA's issuing and maintaining the loan. (For instance, although the HFA did not directly require 23rd Chelsea to pay an origination fee to Hypo Bank, the HFA required 23rd Chelsea

to secure a letter of credit from Hypo Bank, which in turn required an origination fee.) 23rd Chelsea included each component of the financing costs in eligible basis only to the extent that it deemed that component to relate to both (1) the portion of the real estate composed of residences and common areas and (2) costs incurred during the construction period (approximately June 1, 2001, to August 13, 2002). Therefore, 23rd Chelsea first reduced each cost component by 1.61%, the percentage of the bond proceeds allocated to the health club and retail space. It then removed all fee amounts paid (or deemed paid) for services occurring after the construction period. For many of the cost components, this second step involved prorating lump-sum payments over the months during which the HFA loan, the bonds, and/or the Hypo Bank letter of credit remained (or were projected to remain) outstanding, then tallying only the amounts prorated for the months of the construction period. 23rd Chelsea's computation of eligible basis includes only financing costs that were paid before the Tate was ever placed in service.

In 2004, 23rd Chelsea presented to the HFA an independently audited final cost certification, which included a detailed calculation of eligible basis. (That calculation explicitly included in eligible basis a portion of the financing costs totaling $1,218,320, as detailed in the table *supra* pp. 5–6.) The HFA was responsible for allocating to the Tate no greater amount of LIHC than an amount "necessary for the financial feasibility of the project and its viability as a qualified low-income housing project." *See* I.R.C. § 42(m)(2)(A). The HFA was also responsible for specifying the maximum qualified basis[6] that 23rd Chelsea could use for computing its LIHC. *See* I.R.C. § 42(h)(7)(D). The HFA did not dispute 23rd Chelsea's calculation of eligible basis, qualified basis, or LIHC amount.

III. *The FPAA*

In the FPAA the Commissioner determined that 23rd Chelsea's eligible basis in the Tate included neither the $1,204,362 of union dues and pension contributions (paid on behalf of one of 23rd Chelsea's subcontractors) nor the $1,218,320 of financing costs that 23rd Chelsea had included. The Commissioner therefore proposed decreasing the LIHC credit amount claimed by 23rd Chelsea for tax year 2009 by $20,079, i.e., the amount of the claimed credit allocable to the alleged

---

[6] Qualified basis is a specified percentage of eligible basis. *See infra* pp. 10–11. Therefore, the HFA was effectively responsible for specifying the Tate's maximum eligible basis.

overstatement of eligible basis. The Commissioner also proposed, under section 42(j), recapturing $49,568 of the credits taken for tax years 2003 through 2008.

The Commissioner now concedes that 23rd Chelsea properly included the full amount of the union dues and pension contributions in eligible basis.[7] Therefore, we must decide only whether $1,218,320 of the financing costs was properly included—and, if some or all of that amount was not, whether 23rd Chelsea is subject to the credit recapture provisions of section 42(j). As discussed below, the Commissioner has offered two arguments to support his determination that the financing costs (including bond fees) were not includible in eligible basis: one relevant to all the costs and one limited to those costs allocable to the tax-exempt bonds. Our ultimate holding does not rest on the distinction between taxable and tax-exempt bonds.

*Discussion*

## I. *Jurisdiction*

The Tax Court is a court of limited jurisdiction and may exercise jurisdiction only to the extent authorized by Congress. *Judge v. Commissioner*, 88 T.C. 1175, 1180–81 (1987); *Naftel v. Commissioner*, 85 T.C. 527, 529 (1985). We are without authority to enlarge upon that statutory grant. *See Phillips Petrol. Co. & Affiliated Subs. v. Commissioner*, 92 T.C. 885, 888 (1989). We nevertheless always have jurisdiction to determine whether we have jurisdiction over a matter brought before us. *Hambrick v. Commissioner*, 118 T.C. 348 (2002). And we must assure ourselves of our jurisdiction even when not asked to by the parties. *Brannon's of Shawnee, Inc. v. Commissioner*, 69 T.C. 999, 1004 (1978).

Under the default rules of Treasury Regulation § 301.7701-2(a) and (c)(1), noncorporate entities with more than one member (such as limited liability companies) are treated as partnerships for federal tax purposes. Because 23rd Chelsea's TMP filed the Petition for readjustment of partnership items within 90 days of the Commissioner's FPAA, we have jurisdiction under section 6226(f) to determine all of 23rd Chelsea's "partnership items" for tax year 2009. Section 6231(a)(3) defines "partnership item" as "any item required to be taken into

---

[7] The Commissioner initially disputed these amounts because 23rd Chelsea had not provided satisfactory evidence that the amounts were in fact paid for construction labor.

account for the partnership's taxable year . . . to the extent regulations prescribed by the Secretary provide that . . . such item is more appropriately determined at the partnership level than at the partner level." Treasury Regulation § 301.6231(a)(3)-1(a)(1)(i) provides that partnership items include the partnership aggregate, and each partner's share, of items of income, gain, loss, deduction, or credit of the partnership. Thus, 23rd Chelsea's allowable LIHC for tax year 2009 (a credit) and the alleged recapture amount (an income item) are both partnership items subject to redetermination in this proceeding.

II.    *Computation of the LIHC*

Congress added the LIHC to the Code to incentivize construction and rehabilitation of residential rental units for low-income tenants. *See* H.R. Rep. No. 99-841 (Vol. II) (Conference Report), at II-85 (1986) (Conf. Rep.), *reprinted in* 1986-3 C.B. (Vol. 4) 1, 85. The credit is reserved for "qualified low-income building[s]." I.R.C. § 42(a)(2). These are buildings that meet the following three requirements:

1.    The building consists of "residential rental property" that satisfies at least one of two tests relating to rent restrictions and tenant income levels. *See* I.R.C. § 42(c)(2), (g).[8]

2.    The residential rental property satisfies one of the two tests (whichever is elected by the taxpayer) for at least 15 years after it is placed in service. I.R.C. § 42(c)(2)(A), (i)(1).

3.    The building is eligible for the modified accelerated cost recovery system (MACRS) of section 168 (as amended in

---

[8]    Sec. 42(g)(1). In general.—The term "qualified low-income housing project" means any project for residential rental property if the project meets the requirements of subparagraph (A) or (B) whichever is elected by the taxpayer:

    (A) 20-50 test.—The project meets the requirements of this subparagraph if 20 percent or more of the residential units in such project are both rent-restricted and occupied by individuals whose income is 50 percent or less of area median gross income.

    (B) 40-60 test.—The project meets the requirements of this subparagraph if 40 percent or more of the residential units in such project are both rent-restricted and occupied by individuals whose income is 60 percent or less of area median gross income.

1986).  *See* I.R.C. § 42(c)(2)(B) (providing that "the amendments made by section 201(a) of the Tax Reform Act of 1986" must apply to the building; Tax Reform Act of 1986, Pub. L. No. 99-514, § 201(a), 100 Stat. 2085, 2121–37 (amending section 168).

The LIHC for a given building is prorated over a period of ten years (credit period), beginning in the tax year the building is placed in service or, at the taxpayer's election, the following tax year.  I.R.C. § 42(a), (f)(1).  During each year of the credit period, the taxpayer receives a credit equal to an "applicable percentage," specified annually by the Internal Revenue Service (IRS), of the building's qualified basis (discussed below).  I.R.C. § 42(a).  The applicable percentage is calculated so that the discounted present value of the ten annual credit amounts (as measured from the end of the credit period's first year) equals 70% of qualified basis for certain new buildings.  I.R.C. § 42(b).  However, if the building is funded at least in part with proceeds from tax-exempt bonds, then unless the taxpayer excludes from eligible basis the proceeds of those bonds, the applicable percentage is calculated so that the discounted present value of the ten credits equals only 30% of qualified basis.  I.R.C. § 42(b)(2)(B)(ii),[9] (i)(2).  (Because the Tate was ultimately financed in part by tax-exempt bonds, 23rd Chelsea computed its LIHC using the lower applicable percentage.)

A building's qualified basis is generally computed in the following way:

1.  Determine the building's eligible basis, which equals its adjusted basis at the end of the first year of the credit period (but prior to any reduction for depreciation), less any amount of basis allocable to property that is not residential rental property (although the basis allocable to common areas is included).  I.R.C. § 42(d)(1), (4).

2.  Increase the eligible basis by 30% if the building is in an area with a high concentration of low-income residents, a high poverty rate, or high construction, land, and utility costs.  I.R.C. § 42(d)(5)(C).

3.  The qualified basis equals the eligible basis multiplied by the "applicable fraction," which is the lower of (i) the fraction of residential rental units that are rent restricted

---

[9] The provision is currently codified at section 42(b)(1)(B)(ii).  *See supra* note 5.

and occupied by low-income tenants or (ii) the fraction of residential rental floor space allocated to such low-income units. I.R.C. § 42(c)(1), (i)(3).[10]

Section 42 also provides for the recapture, in certain circumstances, of some of the credits allowed for prior years. The recapture provisions apply if, at the end of any year during the 15-year compliance period (beginning with the first year of the credit period), the building's qualified basis is lower than it was at the end of the previous year.[11] I.R.C. § 42(j)(1).

III.   *23rd Chelsea's Eligible Basis*

The only part of 23rd Chelsea's computation of its LIHC for tax year 2009 that the Commissioner disputes (after conceding the union dues and pension contributions) is the inclusion of $1,218,320 of the financing costs in eligible basis. We must look to the terms of section 42 to resolve the dispute. Section 42(d)(1) provides that "[t]he eligible basis of a new building is its adjusted basis as of the close of the 1st taxable year of the credit period." Section 42(d)(4)(A) clarifies that "the adjusted basis of any building shall be determined without regard to the adjusted basis of any property which is not residential rental property." There is no other statutory exclusion from eligible basis that the Commissioner argues is relevant to this case.

Section 42 does not expressly define "adjusted basis," so we look to section 1011(a), which provides the default rule that "[t]he adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under

---

[10] 23rd Chelsea computed its annual credit of $593,961 as follows: (1) The Tate had a preliminary eligible basis of $71,665,478 (the sum of hard costs and soft costs that 23rd Chelsea determined to be eligible); (2) pursuant to section 42(d)(5)(C), the preliminary eligible basis was increased by 30%, to $93,165,121; (3) the eligible basis was multiplied by an applicable fraction of 18.32% (39,863 square feet of low-income housing units divided by total square footage of 217,613), yielding a qualified basis of $17,067,850; and (4) the qualified basis was multiplied by an applicable percentage of 3.48% designated by the IRS for tax year 2002, *see* Rev. Rul. 2002-48, 2002-2 C.B. 239, 241, yielding an LIHC of $593,961. Although 23rd Chelsea elected to begin the credit period in 2003, the applicable percentage generally corresponds to the year in which the building is placed in service (here, 2002). *See* I.R.C. § 42(b)(2)(A).

[11] This may occur if, for instance, the applicable fraction decreases by reason of fewer units being reserved for low-income tenants. Note that eligible basis cannot change over time, since it is calculated as of the end of the credit period's first year (here 2003).

section 1012 . . . ), adjusted as provided in section 1016."[12]  Section 1012, in turn, provides that "[t]he basis of property shall [generally] be the cost of such property."  Section 263A then clarifies this definition of basis as it applies to taxpayer-produced real property (or other tangible property) such as the Tate.  That section provides that "the direct costs of such property" and "such property's proper share of those indirect costs . . . part or all of which are allocable to such property" must be "capitalized."   I.R.C. § 263A(a) and (b)(1).   Treasury Regulation § 1.263A-1(c)(3) explains that "capitalize," in the case of real property, means "to charge to a capital account or basis," while Treasury Regulation § 1.263A-1(c)(1) provides, in relevant part, that "taxpayers must capitalize their direct costs and a properly allocable share of their indirect costs *to property produced*."  (Emphasis added.)

It follows from these provisions, taken together, that the adjusted basis of taxpayer-produced real property (before any reduction for depreciation) typically equals the sum of the property's direct costs and its properly allocable share of indirect costs.[13]  We reach this conclusion as follows: (1) the direct costs and properly allocable share of indirect costs must be capitalized to the property; (2) "capitalize" means to charge to a capital account or basis; and (3) basis is adjusted for any expenditures charged to the capital account.  *See* I.R.C. § 1016(a)(1). Therefore, the Tate's eligible basis was the sum of 23rd Chelsea's direct construction costs and a properly allocable share of the indirect construction costs, minus costs allocable to portions of the building that were not "residential rental property" at the end of the first year of the credit period.  *See* I.R.C. § 42(d)(4)(A).[14]

For taxpayer-produced real or tangible property such as the Tate, Treasury Regulation § 1.263A-1(e)(2)(i) defines "direct costs" as the sum of "direct material costs" and "direct labor costs."  Treasury Regulation § 1.263A-1(e)(3)(i) provides that "[i]ndirect costs are defined as all costs

---

[12] Our recourse to section 1011 and its compatriots is supported not only by the fact that those sections function (by their terms) as rules of general application for Subtitle A (Income Taxes) of the Code but also by the reference to section 1016 in section 42(d)(4)(D): "The adjusted basis of any building shall be determined without regard to paragraphs (2) and (3) of section 1016(a) [dealing with depreciation, amortization, and the like]."

[13] We ignore adjustments for depreciation pursuant to section 42(d)(4)(D).

[14] Although the Tate's construction was financed in part by tax-exempt bonds, 23rd Chelsea did not elect under section 42(i)(2)(B) to exclude those bond proceeds from eligible basis.  Instead, 23rd Chelsea chose to have the discounted present value of its credits equal 30% of qualified basis rather than 70%.  *See* I.R.C. § 42(b)(2)(B).

other than direct material costs and direct labor costs" and that they are properly allocable to taxpayer-produced property "when the costs directly benefit or are incurred by reason of the performance of production . . . activities." The U.S. Court of Appeals for the Second Circuit[15] has held that for indirect costs to be "incurred by reason of" the performance of production activities, "the costs . . . must be a but-for cause of the taxpayer's production activities." *Robinson Knife Mfg. Co., Inc. & Sub. v. Commissioner*, 600 F.3d 121, 131–32 (2d Cir. 2010), *rev'g and remanding* T.C. Memo. 2009-9; *see also City Line Candy & Tobacco Corp. v. Commissioner*, 624 F. App'x 784, 787 (2d Cir. 2015) ("[*Robinson Knife*] requires capitalization only of costs that are a 'but-for cause' of the taxpayer's production or sales activity." (quoting *Robinson Knife Mfg. Co. v. Commissioner*, 600 F.3d at 131–32)), *aff'g* 141 T.C. 414 (2013).

Here, we hold that at least $1,218,320 of the financing costs (which included bond fees) were a but-for cause of the Tate's construction, given 23rd Chelsea's decision to finance construction by borrowing from the HFA. Specifically, all amounts of the financing costs that 23rd Chelsea included in its computation of eligible basis were necessary to induce the HFA to initiate and/or maintain the $110 million loan used for construction of the Tate. Moreover, the amount of each cost component that 23rd Chelsea allocated (by proration or otherwise) to the construction and production period was incurred during that period, i.e., before the Tate was ever placed in service. Therefore, 23rd Chelsea incurred at least $1,218,320 of the financing costs "by reason of" the Tate's construction within the meaning of Treasury Regulation § 1.263A-1(e)(3)(i), as interpreted by the Second Circuit.

Treasury Regulation § 1.263A-1(e)(3)(i) acknowledges that certain indirect costs may be allocable to both production activities and activities not subject to section 263A, in which case taxpayers must make a "reasonable allocation of indirect costs" between the former and the latter. However, nothing in this regulation indicates that the costs of obtaining financing for production activities are necessarily allocable to a separate "financing" activity not subject to section 263A. In fact, we note that section 263A(f)(1) confirms that interest on loans used to finance the production of property generally must be capitalized under

---

[15] This case is appealable to the Second Circuit absent a contrary stipulation by the parties. *See* I.R.C. § 7482(b)(1)(E). Therefore, we follow all Second Circuit precedent that is squarely on point. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

the rule of section 263A(a), although Congress has provided that the latter rule applies only to interest "paid or incurred during the production period" and allocable to property with "a long useful life," such as residential property like the Tate. Section 263A(f) thus indicates that financing costs allocable to the production period are not per se allocable to a "financing" activity separate and apart from production.

Therefore, we hold that for purposes of Treasury Regulation § 1.263A-1(e)(3)(i), the costs of obtaining financing for production activities are not allocable to a separate "financing" activity (ostensibly not subject to section 263A) insofar as those costs are allocable to the production period. Rather, 23rd Chelsea's financing of the Tate's construction through loans funded by bond issuances was an "indivisible part" of the construction to the extent that that financing was allocable to the production period. *City Line Candy & Tobacco Corp.*, 141 T.C. at 431 n.20 (finding that the taxpayer's purchase of cigarette tax stamps, a legal prerequisite of reselling the cigarettes, was an "indivisible part" of the taxpayer's resale activity); *cf. Anschutz Co. v. Commissioner*, T.C. Memo. 2006-40, 91 T.C.M. (CCH) 860, 867–68 (holding that the taxpayer, which had installed fiberoptic cable or conduit for its own future use simultaneously with installing cable or conduit for third parties, must make a reasonable allocation of indirect costs between its production activities and its long-term contract activities, the latter of which are excluded from section 263A by section 263A(c)(4)), *supplemented by* T.C. Memo. 2006-124.

Accordingly, under section 263A(a)(2)(B) and Treasury Regulation § 1.263A-1(e)(3)(i), 23rd Chelsea was required to capitalize into the Tate's basis the incurred financing costs that were a but-for cause of production. Accordingly, the Tate's eligible basis includes all the financing costs that were (1) allocable to the residential rental property, (2) a but-for cause of the Tate's construction, given 23rd Chelsea's decision to finance construction with the HFA loan, and (3) incurred by the end of 23rd Chelsea's 2003 tax year (i.e., the first year of the credit period). The record clearly indicates that the amount of financing costs includible in the Tate's eligible basis was at least the amount that 23rd Chelsea actually included (viz, $1,218,320).[16]

---

[16] We note that Treasury Regulation § 1.263A-2(a)(3)(i) generally provides that taxpayers must capitalize into taxpayer-produced property all indirect costs properly

IV.     *The Commissioner's Arguments*

The Commissioner offers two arguments against 23rd Chelsea's position.

A.     *Depreciation Provisions*

First, the Commissioner notes that the LIHC statute requires a building to be subject to MACRS in order to be a "qualified low-income building." *See* I.R.C. § 42(c)(2)(B). The Commissioner then argues that the costs of obtaining bond proceeds should be capitalized into the underlying loan and thus are subject to depreciation under section 167 but not to MACRS under section 168—rendering those bond costs ineligible to be part of the "qualified low-income building" for purposes of section 42. Section 167(a) allows depreciation deductions generally for "exhaustion, wear and tear . . . of property used in the trade or business," while the accelerated deductions of section 168 are reserved for "tangible property." I.R.C. § 168(a). (Accordingly, all section 168 deductions are section 167 deductions, but not all section 167 deductions are section 168 deductions.)

However, the Commissioner overlooks the changes that Congress made in adopting "uniform capitalization rules" (including section 263A) in 1986. *See* Tax Reform Act of 1986, § 803(a), 100 Stat. at 2350–55. Those new rules displace prior law where inconsistent. The Senate Finance Committee provided helpful background on the changes:

> The committee believes that the present-law rules regarding the capitalization of costs incurred in producing property are deficient in two respects. First, the existing rules may allow costs that are in reality costs of producing, acquiring, or carrying property to be deducted currently, rather than capitalized into the basis of the property and recovered when the property is sold or as it is used by the taxpayer. This produces a mismatching of expenses and the related income and an unwarranted deferral of taxes. Second, different capitalization rules may apply under

---

allocable to the property "without regard to whether those costs are incurred before, during, or after the production period." Here, the parties have not asserted that indirect costs incurred outside the production period might qualify for capitalization and inclusion in eligible basis. Consequently, we have not addressed the issue of preproduction or postproduction costs under section 263A and decline to do so on our own.

present law depending on the nature of the property and its intended use. These differences may create distortions in the allocation of economic resources and the manner in which certain economic activity is organized.

The committee believes that, in order to more accurately reflect income and make the income tax system more neutral, a single, comprehensive set of rules should govern the capitalization of costs of producing, acquiring, and holding property, including interest expense, subject to appropriate exceptions where application of the rules might be unduly burdensome.

S. Rep. No. 99-313, at 140 (1986), *as reprinted in* 1986-3 C.B. (Vol. 3) 1, 140.

The Tate is tangible business property subject to wear and tear and thus eligible for MACRS under section 168. Section 42(d)(1) accordingly directs us to find the Tate's adjusted basis at the end of the first year of the credit period, which—under section 263A and the accompanying regulations, as discussed above—includes the financing costs incurred for production. The fact that 23rd Chelsea's bond-financed loan from the HFA was not tangible property is irrelevant, because the related costs were indirect costs "incurred by reason of" the Tate's construction. *See* Treas. Reg. § 1.263A-1(e)(3)(i).

The regulations under section 263A specifically enumerate several categories of capitalizable indirect costs that, but for section 263A, might otherwise be deducted or capitalized into an intangible asset (and then either amortized or depreciated under section 167 but not under MACRS). *See, e.g.*, Treas. Reg. § 1.263A-1(e)(3)(ii)(M) (requiring capitalization into taxpayer-produced property of "the cost of insurance on plant or facility, machinery, equipment, materials, property produced, or property acquired for resale," which if prepaid might otherwise be capitalized into an intangible asset);[17] *id.* subdiv. (ii)(P) (requiring capitalization into taxpayer-produced property of "[e]ngineering and design costs," some of which might otherwise be capitalized into intellectual property); *id.* subdiv. (ii)(T) (requiring capitalization into taxpayer-produced property of "[b]idding costs," i.e.,

---

[17] For instance, in *Johnson v. Commissioner*, 108 T.C. 448, 488 (1997), *aff'd in part, rev'd in part, and remanded on another issue*, 184 F.3d 786 (8th Cir. 1999), we required the taxpayer to capitalize and amortize the portion of a premium for excess loss insurance coverage that was allocable to tax years after the year of payment.

"costs incurred in the solicitation of contracts [to produce property]," which might otherwise be capitalized into the contracts solicited); *id.* subdiv. (ii)(U) (requiring capitalization into taxpayer-produced property of "[l]icensing and franchise costs," including "fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right," which might otherwise be capitalized into the license or franchise right). Therefore, when we look to the uniform capitalization rules, we discover that the plain statutory text, the legislative history, and the regulations all belie the Commissioner's argument that 23rd Chelsea should have capitalized the financing costs into an intangible asset rather than the Tate.

B.    *Legislative History*

The Commissioner next argues that even if some portion of the financing costs is includible in the Tate's adjusted basis for purposes of depreciation deductions under sections 167 and 168, the legislative history of section 42 shows that the portion of the costs allocable to the tax-exempt bonds is not includible in the Tate's eligible basis for purposes of the LIHC.[18] The Commissioner's argument proceeds as follows:

1.    Section 42(d)(4)(A) provides that generally "the adjusted basis of any building shall be determined without regard to the adjusted basis of any property which is not residential rental property."

2.    The Conference Report at II-89, 1986-3 C.B. (Vol. 4) at 89, states that "[r]esidential rental property for purposes of the low-income housing credit has the same meaning as residential rental property within Code section 103."

3.    Section 103 (which provides an exclusion for interest on certain state and local bonds) is statutorily linked to section 142, which defines the term "exempt facility bond" as "any bond issued as part of an issue 95 percent or more of the net proceeds of which are used to provide . . . [among other things] qualified residential rental projects." I.R.C.

---

[18] In his posttrial brief, the Commissioner contends that 23rd Chelsea effectively conceded that all the financing costs were allocable to the tax-exempt bonds, by virtue of 23rd Chelsea's not timely raising the possibility of including in eligible basis only a proper portion of the financing costs allocable to the taxable bonds. However, our holding under section 263A does not distinguish between financing costs for tax-exempt versus taxable bonds.

§ 142(a). Section 142(d)(1) provides that "[t]he term 'qualified residential rental project' means any project for *residential rental property*." (Emphasis added.)

4.  The Conference Report at II-697, 1986-3 C.B. (Vol. 4) at 697, explains the procedure for determining whether at least 95% of the net proceeds of a candidate exempt facility bond were used for an exempt purpose, such as a qualified residential rental project (95% test): "Net proceeds are defined as proceeds less amounts invested in a reasonably required reserve or replacement fund. (No reduction is made for amounts paid for costs of [bond] issuance since those amounts are not treated as spent for the exempt purpose of the borrowing.)"

5.  Because issuance fees for tax-exempt bonds are not deducted from net bond proceeds in determining the proportion of such proceeds used for constructing residential rental property for purposes of the 95% test in section 142, they should not be treated as costs for residential rental property (and thus should not be includible in basis) in the context of section 42. To do otherwise would impermissibly result in "disparate treatment of the term residential rental property" between the two sections, contrary to the Conference Report's implication that the term has the "same meaning" in both sections.

First of all, we note that the Commissioner has not alleged any ambiguity in the relevant text of section 42, viz: "[T]he adjusted basis of any building shall be determined without regard to the adjusted basis of any property which is not residential rental property." *See* I.R.C. § 42(d)(4)(A). When statutory terms have a clear and unambiguous meaning on their face, we do not look past that meaning to the legislative history. As the Supreme Court has said:

In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011). Where . . . that examination yields a clear answer, judges must stop. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019); *see also Sullivan v. Stroop*, 496 U.S. 478, 482 (1990).

Even assuming that the legislative history the Commissioner cites is legitimate evidence for our construction of section 42, it does not speak against our holding as to the Tate's eligible basis. For our holding does not import a different meaning to the phrase "residential rental property" in section 42 compared to section 142. The difference we find is not in the definition but rather the requirements Congress imposed on the use of tax-exempt funds in financing low-income housing projects. In section 142 Congress provided (implicitly in the statute, explicitly in the Conference Report) that 95% of bond proceeds (unreduced by bond issuance costs) must be used in acquiring qualified residential property, meaning that 5% may be used otherwise. By contrast, we hold that for purposes of determining eligible basis in section 42, bond issuance costs are allocable to residential rental property, provided that they were incurred by reason of construction or production. There is no inconsistency in definition; at most, there is a difference in the allocation of costs. But that difference violates no rule of statutory construction or expression of congressional intent. Congress already specifically reduced the LIHC for buildings financed with tax-exempt bonds by mandating an applicable percentage calculated so that the discounted present value of the ten annual credits equals 30%, rather than 70%, of qualified basis. I.R.C. § 42(b)(2)(B)(ii). If Congress had intended to further rein in the LIHC for such buildings by excluding tax-exempt bond issuance costs from eligible basis, it could have said so in the statute. We will not judicially impose such an exclusion. *See Greer v. Commissioner*, 230 F.2d 490, 493–94 (5th Cir. 1956) ("We think that the tax statutes and regulations must be applied as written and without any equitable consideration of the desirability of offsetting prior tax benefits."), *rev'g Brazoria Inv. Corp. v. Commissioner*, 20 T.C. 690 (1953).

We therefore do not uphold the Commissioner's proposed adjustments in the FPAA, and we do not reach the question of whether the credit recapture provisions of section 42(j) would apply to 23rd Chelsea. We have considered all arguments made by the parties and, to the extent they are not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for Petitioner.*